In re SCIENTIFIC CONTROL CORPORATION SECURITIES LITIGATION.

MASCOLO et al., Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Defendant.

Kenneth F. REILLY et al., Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Defendant.

Max G. BAUMGARDNER et al., Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Defendant.

Nos. 72 Civ. 3292–CLB, 74 Civ. 3288–CLB, 74 Civ. 3289–CLB, MDL No. 157.

United States District Court, S. D. New York.

March 22, 1976.

On Reargument July 19, 1976.

Stotsenburg & Donohue, P. C. by R. Alan Stotsenburg, New York City, McKenzie & Baer by A. Joe Fish, Dallas, Tex., Lovejoy, Wassen, Lundgren & Ashton, P. C. by Daniel J. Sullivan, New York City, for plaintiffs.

Brown, Wood, Ivey, Mitchell & Petty by Henry F. Minnerop, James Manning, New York City, for defendant.

## MEMORANDUM DECISION

BRIEANT, District Judge.

Plaintiffs commenced *Mascolo v. Merrill Lynch etc.*, 72 Civ. 3299, on August 2, 1972 in the Southern District of New York. *Reilly v. Merrill Lynch etc.* was commenced in the Northern District of Texas on July 28, 1972. Both complaints alleged violations of the federal securities laws and sought damages on behalf of all Merrill Lynch customers who purchased stock in Scientific Control Corporation ("SCC") in 1968 and 1969. *Baumgardner v. Merrill Lynch etc.* was commenced in the Western District of Kentucky on behalf of all customers who purchased SCC stock through the Louisville, Kentucky office of Merrill Lynch. On July 26, 1974, the Judicial Panel on Multidistrict Litigation transferred all three cases to the Southern District of New York, pursuant to 28 U.S.C. § 1407, for coordinated and consolidated pre-trial proceedings.

Prior to coordination by the Judicial Panel on Multidistrict Litigation, the *Mascolo* plaintiffs moved, pursuant to Rule 23, F.R. Civ.P., for an order certifying their suit as a class action. In an opinion dated December 6, 1973, 61 F.R.D. 481 (S.D.N.Y.1973), Judge Tyler of this Court held in abeyance a decision of whether this action was suitable for class treatment, pending further discovery

to determine the commonality of the class claims and, more particularly, what role, if any, individual Merrill Lynch account executives played in the sale of SCC stock. To that end, the parties have deposed a sampling of Merrill Lynch personnel and additional plaintiffs.

The *Mascolo* plaintiffs renew their motion for class action certification. The *Reilly* and *Baumgardner* plaintiffs have moved conditionally to discontinue their action on the ground that, if the class were certified, they would be represented by the *Mascolo* plaintiffs.

Jurisdiction is conferred here by § 27 of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78aa. Plaintiffs' second amended complaint recites seven separately denominated claims for relief alleging violations of §§ 10(b), 11(d)(2) and 15(c) of the Act, 15 U.S.C. §§ 78j(b), 78k(d)(2) and 78o (c), and of Rules 10b–3, 10b–5, 15cl–2, 15cl–4 and 15cl–6 promulgated thereunder. Plaintiffs' renewed motion for class certification is now limited to five of the seven claims for relief pleaded in their second amended complaint.[1]

Plaintiff's renewed motion to maintain this litigation as a class action is granted solely as to the claim pleaded in Count 6; and in all other respects, is denied.

Plaintiffs seek to represent all Merrill Lynch customers who purchased SCC shares between March 1, 1968 and November 21, 1969.[2] There are three plaintiffs in the *Mascolo* action: Jeanne J. Mascolo, James F. Heffernan and Alton L. McLain.[3] Mascolo purchased 200 shares of SCC stock at 30½ on August 14, 1969 through an account executive in Merrill Lynch's Roslyn, New York office. Heffernan purchased 100 shares at 34½ on June 30, 1969 through an account executive in Merrill Lynch's Flatbush Avenue branch in Brooklyn, New York. McLain purchased 100 shares at 19 on November 7, 1969 through an account executive in the New Haven, Connecticut office of Merrill Lynch. The *Reilly* plaintiffs, whose depositions comprise a portion of the consolidated file in this case, purchased their shares at different prices on various dates in 1968 and 1969 through Merrill Lynch branch offices in Texas.

Plaintiffs allege that Merrill Lynch employed a scheme to defraud and engaged in a course of conduct which operated as a fraud on its customers in their purchases of SCC stock. Rule 10b–5(1), (3); 17 C.F.R.

---

1. Plaintiffs do not seek class certification for the claims set forth in Counts Two and Seven of their second amended complaint. Count Two alleges that Merrill Lynch had a confidential investment banking relationship with SCC through which defendant acquired non-public information. Count Two further alleges that defendant violated §§ 10(b) and 15(c)(1) of the Act by failing to disclose to its brokerage customers the existence of that investment banking relationship and its implications in regard to Merrill Lynch's investment recommendations and its acting as a dealer-principal in transactions with its customers in this security. Count Seven charges that Merrill Lynch failed to disclose the sizeable holdings of its officers and employees in SCC stock and failed to disclose the size of Merrill Lynch's holdings (even if only as record owner in street-name) in SCC. It is contended that this should have been disclosed since it was material to a purchaser's effective evaluation of the strength of the market for SCC stock.

2. Plaintiffs have suggested three separate formulations for the composition of the class. The different formulations are applicable to the various claims for relief. Under Count One, plaintiffs propound a class composed of customers who purchased SCC between March 1, 1968 and November 10, 1969, the closing date being the date on which Merrill Lynch ceased recommending the purchase of SCC and expressed "no opinion." Under Counts Three and Four, plaintiffs propose that the class comprise all customers who purchased (Count Three) or held (Count Four) SCC shares from March 1, 1968 through November 21, 1969, the date on which SCC filed for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 *et seq.*, except for those who sold prior to August 1, 1969. For Counts Five and Six, plaintiffs seek to represent a class comprised of customers who purchased at any time from March 1, 1968 until November 21, 1969.

3. When the initial complaint in this action was filed in 1972, Dr. Delfino Mascolo, the husband of plaintiff Jeanne J. Mascolo, was also a plaintiff. Dr. Mascolo died during the pendency of this action. Mrs. Mascolo was Merrill Lynch's customer. Dr. Mascolo held a power of attorney with respect to transactions in her account.

240.10b–5(1), (3). The complaint charges that from March 1, 1968 through November 21, 1969 the defendant engaged in a common course of conduct which

> "produced a continuous common core of misrepresentation/omission, which in fact was similar in content and which was disseminated in a standardized manner to plaintiffs and the class of Merrill Lynch customers." (Complaint, ¶ 19).

Although couched in terms of a fraudulent course of conduct and a scheme to defraud, the complaint, in essence, alleges a series of material misrepresentations and omissions. In their argument in support of this motion, plaintiffs themselves have so characterized their complaint, stating:

> "[M]any of these practices by themselves would not amount to fraudulent conduct, and if disclosed they could not, even together. But the combination of these practices as they affected the marketing of SCC stock, and the fact that they could not have been learned by the customers under the system as established, amounts to a fraudulent scheme." (Plaintiffs' Memorandum of Law on Resubmission of Class Action Motion, p. 54).

This fraudulent course of conduct is alleged to have had its roots in the Merrill Lynch Securities Research Division (hereinafter "Research"). Research disseminated information together with its interpretation and opinion, to the various branch offices by a number of devices. The primary means of communication between Research and Merrill Lynch's large force of registered representatives (hereinafter "account executives") was through a computerized information retrieval system, called "QRQ". Each branch office was a participant in the QRQ network. The QRQ system was activated by the account executive in a branch office placing an inquiry concerning a particular stock. The computer would then provide the account executive placing the inquiry with a copy of the current printout of investment information concerning that stock which was then stored in the computer's memory bank. The information stored in the QRQ was reviewed for accuracy on a regular basis, and would be amended periodically as the need arose. In March 1968, the QRQ system contained Merrill Lynch opinions on over 2,100 stocks.

The QRQ printout included a price quotation as of the date of the last revision of the QRQ, and a statement of the dividend history of the stock. The printout featured three concise Merrill Lynch evaluations: (1) a quality rating of the stock; (2) an expression of one of three possible classifications based on investment characteristics; and (3) an expression of one of four possible classifications based on investment strategy.[4] The printout also provided a textual description of important characteristics and developments of the issuer, subject to the 550 character limitation to the capacity of this portion of the retrieval system.

Merrill Lynch first expressed an evaluation of SCC through the QRQ system on February 29, 1968. From that date until some time in November 1969 when it ceased expressing an opinion, Merrill Lynch rated the quality of SCC as "speculative" and repeated this admonition in the opening words of each of its QRQ textual descriptions throughout the period. For the entire relevant period, Merrill Lynch rated SCC on the basis of its investment characteristics as "Suitable for Growth" which was defined by Merrill Lynch as: "Earnings of these securities have increased and are expected to increase at a faster than average rate."

The Merrill Lynch investment strategy rating changed during the relevant time period as follows:

> March 1, 1968 to June 3, 1968— # 1— "Buy/Hold"

---

4. The three possible classifications based on investment characteristics were entitled "suitable for growth," "defensive" and "cyclical." At all times here relevant, SCC was classified as being "suitable for growth."

The four possible classifications based on investment strategy were "Buy/Hold," "Hold/Not OK to Exchange," "Hold/OK to Exchange" and "Sell." These classifications were also expressed numerically as Nos. 1, 2, 3 or 4, respectively. SCC's investment strategy rating changed during the period here relevant, as described *infra*, p. 496.

June 3, 1968 to December 17, 1968— # 2—"Hold/Not OK to Exchange"

December 17, 1968 to October 16, 1969 — # 1—"Buy/Hold"

October 16, 1969 to November 10, 1969 — # 3—"Hold/OK to Exchange"

November 10, 1969 to November 21, 1969 —No Opinion

These numerical investment strategy ratings were reproduced and disseminated biweekly to all Merrill Lynch retail offices in a booklet format.

The numerical rating given for investment strategy provided a guideline for the account executives, either formally or informally, in their solicitation of purchase orders. Willard Pierce, a Merrill Lynch research analyst, testified before the Securities and Exchange Commission that it was firm policy that account executives were not to solicit purchase orders on issues which did not have a # 1 or # 2 rating currently in effect. (Exhibit 5 to Affidavit of A. Joe Fish, Esq., sworn to January 31, 1975. See also, Marsh Deposition, p. 41; Zufall Deposition, p. 100). In conversations with customers who were familiar with the QRQ ratings and their significance, some account executives even identified a given security with reference to its investment strategy number rating. (Zufall Deposition, pp. 52–53).

During the relevant period, there were twenty separate texts in the QRQ system discussing SCC. At any time, there was a uniform text in circulation. In nineteen of the twenty texts, SCC is identified as a highly speculative stock of a small or very small firm manufacturing specialty computers. Apart from this description, each text included a timely discussion of current earnings and projections, recent transac-

tions, and an evaluation of the stock's long or medium term potential. Since the purpose was to provide current information on the company, the text reflected developments as they occurred. Periodically, the text would differ considerably from prior texts, notably when SCC would fail to meet an optimistic projection.[5]

In addition to the periodic changes made in the text and ratings in the QRQ system, Research apprised all Merrill Lynch account executives of current developments by means of teletyped analyses known as "wire flashes." Three wire flashes concerning SCC were issued on December 17, 1968, June 9, 1969 and October 16, 1969. The wire flashes provided lengthier discussions of current developments. The last two wire flashes were occasioned by announcements by the management of SCC and included a discussion of the implications of these developments in addition to more general information.

Besides the information provided through the QRQ system and the wire flashes, all Merrill Lynch account executives received or had access to a document entitled "Research Discussion No. 13," dated February 12, 1969, which was a Merrill Lynch report on the office equipment industry. (Defendant's Exhibit C).

Plaintiffs allege that all Merrill Lynch account executives received the same information and opinion concerning SCC through the QRQ computer system, the QRQ bi-weekly rating, the wire flashes and the Research Discussion, all of which emanated from Research.

Defendant contends that the account executives were not limited to the information which they received from Research and that all account executives did not utilize the Research originated materials in the same

---

5. The manner and extent of change in the QRQ text may be illustrated by focusing on the QRQ system's treatment of one particular development. From October 29, 1968 until December 10, 1968, the QRQ text read in part: "Because expansion costs 2nd [Quarter Financial] results will be below 1st, but expect significant sales and earnings improvement in fiscal '69 approaching 50." (Defendant's Exhibit A–11;

Exhibit 3, # 8 to Affidavit of A. Joe Fish, Esq., sworn to January 31, 1975). On December 12, 1968, the text was amended to read: "Because heavy research costs and rapid expansion of marketing expect operate about break even 4–69 fiscal year but fiscal '70 looks promising." (Defendant's Exhibit A–12; Exhibit 3, # 10 to Fish Affidavit.)

fashion. Some of the account executives whose depositions were taken prior to resubmission of this motion testified that they used the QRQ system but only as a quick reference device. Some account executives testified that they supplemented what information they obtained from the QRQ by referring to the then available wire flashes; others testified that they referred to materials that did not originate with Research, notably the SCC annual report, the current sheet in Standard & Poor's Corporation Guide, trade publications and articles in the financial press.[6]

In addition to the QRQ and wire flash opinions, the account executives could receive other and more personalized information from Research. By means of a system known as "QR2", an account executive could place a specific inquiry and receive an individualized response from one of the specialists on SCC in Research.[7] Account executives also had telephone conversations and conference call discussions with Research personnel regarding SCC.[8]

6. The practices of account executives Richard Murphy and Theodore Boots are illustrative of the different approaches employed in the use of Research materials. Murphy testified that in recommending SCC stock to his customers, he relied upon the QRQ's and the wire flashes primarily, and to a lesser extent upon Standard & Poor's Reports. Murphy testified that he had been impressed by the information that he had learned from William D. Whitaker, the "OTC liaison man" in the Louisville, Kentucky office, when he first learned of SCC in March 1968. At his deposition, Boots testified that, in recommending SCC, he referred to the materials provided by Research, but also read Standard & Poor's trade publications and articles that appeared in the Wall Street Journal. In describing the QRQ system, Boots characterized it as

". . . strictly a quick way to initially screen, to see if there is any indication of possible growth, and then we would refer to other documents to support it. This is strictly a quick-scanning apparatus; certainly not a document which you would come to a final decision on. At least I didn't. Now maybe some people do." (Boots Dep. p. 56).

7. Plaintiffs contend that a large proportion of the 114 QR2 documents regarding SCC were insignificant communications or questions to which Research had no response (Affidavit of Jamison Wilcox, Esq., sworn to February 14, 1975). Some of these communications are in-

Finally, some account executives, most notably those in Texas branch offices of Merrill Lynch, obtained information directly by consultation with SCC's management.

It was established Merrill Lynch policy in regard to opinions and advice given to customers that

"[o]pinions issued by [Merrill Lynch] or given in [its] name on specific industries or securities shall be uniform and based upon the opinion as established by the Securities Research Division." (Merrill Lynch Operations Manual, Section 3, Plaintiffs' General Appendix, Exhibit 30).

To give further substance to this policy, Merrill Lynch prohibited its account executives from soliciting purchase orders for securities on which Merrill Lynch had no opinion unless the account executive had the prior approval of his manager, who, in turn, had to obtain clearance from Research. Merrill Lynch described the account executive's role and duties in the research process as follows:

consequential. Some QR2 responses, however, include fact and opinion from Research on such important topics as changes in management at SCC, SCC's market position, earnings reports, cash flow difficulties, efforts to raise funds, and the development of a merger proposal. Some Research responses were only directions that the account executive place a telephone call to Research at a specified time. In view of the apparent purpose of these inquiries, the Court infers from these directions to communicate by telephone that the matters required extensive consultation between the account executive and the Research analyst. Rather than dismissing these communications as insignificant, the Court infers that these QR2's were preludes to significant telephone conversations.

8. Plaintiffs contend that telephone communications constituted a negligible portion of the communication between Research and account executives at the branch offices. Plaintiffs claim that only ten telephone conference calls involving SCC appear in a log maintained by Research, five of which appear to have been with a single account executive. Account executive John T. Duffy testified at his deposition that he himself had participated in between three and five conference calls with Research. The QR2's demonstrate that, apart from the conference call briefings, Research communications were often effected by telephone.

"The Account Executive should be something of a statistician—he is not expected to make exhaustive studies or do a real job of research, but he should know how to dig out the essential facts from an earnings statement and balance sheet. Most important he must have the welfare of the customers at heart." (Id., Section 6–A).

The account executives whose depositions were taken affirmed their knowledge of these policies and testified that they had attempted to comply with these directives. Plaintiffs contend that, following these policies, the account executives solicited the purchase of SCC upon the favorable rating given that stock by Research and conveyed to Merrill Lynch's customers the positive opinion expressed by Research.

In order to qualify for class action treatment, plaintiffs must demonstrate that they satisfy the requirements of Rule 23, F.R. Civ.P. Of particular concern upon this motion are the requirements contained in Rules 23(a)(2), (a)(3) and (b)(3). Rule 23(a)(2) requires that there be "questions of law or fact common to the class" and Rule 23(b)(3) requires a finding that

"the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Rule 23(a)(3) requires that the plaintiffs' claims be typical of the claims of the class.

In describing the potential applications of Rule 23(b)(3), the notes of the Advisory Committee on the 1966 Amendments state that

"a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." 39 F.R.D. 69, 103.

Plaintiffs contend that in following these policies the account executives engaged in a common course of conduct by soliciting the purchase of SCC shares upon the favorable rating given by Research and/or by recommending the purchase of SCC based upon Research's positive information and opinion. This common course of conduct operated through non-disclosure on two levels: alleged failures of Research to disclose information to account executives within the Merrill Lynch organization and alleged misrepresentations and omissions by the account executives in their dealings with Merrill Lynch's brokerage customers.

Defendant controverts plaintiffs' thesis that all account executives had identical information and functioned as no more than mere conduits for the dissemination of Research's opinion. Defendant argues that even assuming plaintiffs' basic thesis, this case is inappropriate for class treatment since Research's opinions themselves changed significantly and often during the nineteen month period covered by the class' claims. Moreover, defendant contends that the overwhelming number of communications between account executives and their customers were oral, and therefore, the representations made were varied and not susceptible to class litigation.

In *Fischer v. Kletz,* 41 F.R.D. 377 (S.D.N. Y.1966), the Court found that the misrepresentations alleged to have been made in a series of financial statements comprised a common core because

"[l]ike standing dominoes, . . . one misrepresentation in a financial statement can cause subsequent statements to fall into inaccuracy and distortion when considered by themselves or compared with previous statements." *Id.,* at 381.

In *Green v. Wolf Corporation,* 406 F.2d 291 (2d Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), the Court of Appeals held that a class should

have been certified, pursuant to Rule 23(b)(3), although plaintiff purchased in reliance upon the third in a series of prospectuses issued by the defendant, and sought to represent a class which included persons who made their purchases while the prior two prospectuses were in effect. The court found, as plaintiff had alleged, that the misrepresentations in the three prospectuses were interrelated and comprised a common course of conduct which, at the early stage at which the issue was presented, would justify class certification. The court further held that individual issues of reliance would not defeat class treatment and suggested that, if it became necessary, the trial court could order separate trials on the issues of reliance and damages. See also, *Korn v. Franchard Corporation,* 456 F.2d 1206 (2d Cir. 1972).

In determining whether a common course of conduct is evidenced by a series of misrepresentations or omissions, courts have adopted a policy favoring the granting of class treatment. *Green v. Wolf Corporation, supra; In re Memorex Security Cases,* 61 F.R.D. 88 (N.D.Cal.1973). In the cases where class treatment has been permitted, the several misrepresentations and omissions were made in documents addressed to the class generally. Most frequently, the cases have involved representations made in published financial statements, or in materials filed with the Securities and Exchange Commission. *See, e. g., Aboudi v. Daroff,* 65 F.R.D. 388 (S.D.N.Y.1974); *In re U. S. Financial Securities Litigation,* 64 F.R.D. 443 (S.D.Cal.1974); *In re Penn Central Securities Litigation,* 347 F.Supp. 1327 (E.D. Pa.1972); *In re Memorex Security Cases, supra; Fischer v. Kletz, supra.*

Where the representations actually made have been memorialized in documents, it can be ascertained as of any particular date what representation was made. Where a single representation is addressed to the class or the public generally at one time, individual questions of what representation was made, to whom it was made and whether it differs in any material way from representations made to other persons

claimed to be similarly situated, are eliminated or minimized. Indeed, the cases which have allowed class treatment where the representations were made in a series of documents distinguish that situation from the situation presented where the representations were oral. *See, In re Memorex Security Cases, supra,* 95; *Siegel v. Realty Equities Corporation,* 54 F.R.D. 420, 425 (S.D.N.Y.1972); *Fischer v. Kletz, supra,* 382.

Where the representations have been made orally, courts have found class treatment inappropriate, finding that the individual issues predominate over the common issues raised. Class treatment has been denied where it is claimed that the purchase of securities was fraudulently induced by the oral representations of stockbrokers or investment advisers. *See, e. g., Felton v. Walston and Co., Inc.,* [Current] CCH Fed. Sec.L.Rep. ¶ 95,320 (S.D.N.Y.1975); *Goldstein v. Regal Crest, Inc.,* 17 F.R.Serv.2d 680 (E.D.Pa.1973); *Speros v. Nelson,* 16 F.R.Serv.2d 1506 (D.Or.1973); *Skydell v. Mates,* 59 F.R.D. 297 (S.D.N.Y.1972). *See also, Blakely v. Lisac,* 357 F.Supp. 255 (D.Or.1972); *Winokur v. Bell Federal Savings and Loan Association,* 58 F.R.D. 178 (N.D.Ill.1972); *Carlisle v. LTV Electrosystems, Inc.,* 54 F.R.D. 237 (N.D.Tex.1972).

In *Goldstein v. Regal Crest, Inc., supra,* class certification was denied where the purported class purchased securities upon oral representations of registered representatives in a single office of the defendant brokerage firm. By comparison, in 1968 and 1969, Merrill Lynch had 170 offices throughout the United States and 43 other offices in 17 foreign countries and employed approximately 5,000 "account executives". (Affidavit of R. Alan Stotsenburg, Esq., sworn to February 14, 1975, ¶ 7).

*Dorfman v. First Boston Corporation,* 62 F.R.D. 466 (E.D.Pa.1974) granted class action certification on securities claims predicated upon certain omissions and misrepresentations in an offering circular. Plaintiff's deposition revealed that it was likely that defendant would be able to rebut plaintiff's claim of reliance upon the circu-

lar itself, but reserved decision upon "the difficult question of whether, if [the registered representative] made his recommendation in reliance on statements in the offering circular, that would suffice to satisfy Mrs. Dorfman's reliance requirement." 62 F.R.D. at 478. The court further stated:

"This is not analogous to cases in which defrauded investors have sued defendants who made a number of separate oral misrepresentations. Those cases have properly been held not to involve a common · core of misrepresentation and hence not suited to class action treatment. *E. g., Morris v. Burchard,* 51 F.R.D. 530 (S.D. N.Y.1971); *Moscarelli v. Stamm,* 288 F.Supp. 453 (E.D.N.Y.1968). It may be argued that the broker's statements were merely an agent's relaying of the contents of the offering circular to his principal. We say this not to intimate any conclusion, but only to suggest that this case is on a different footing from cases in which defendants have made separate oral misrepresentations." 62 F.R.D. at 478, n. 2.

Plaintiffs here proceed upon the theory that the account executives, in making the statements they made, were merely messengers relaying Research's opinion from their employer, Merrill Lynch, to its customers.

In *Moscarelli v. Stamm, supra,* the Court denied class treatment of plaintiffs' claims of churning and margin rules violations predicated on oral representations and agreements. There, the Court held that "[t]he [oral] misrepresentations and agreements might have been similar with respect to all members of the class, but they were not standardized in the same sense as standardized misrepresentations appearing in a prospectus, financial statements and advertisements and standardized agreements. *See, Fischer v. Kletz, [supra],* Although having some common similarities, their face to face oral misrepresentations are individualized and susceptible of material variations, particularly in view of the disparities in the financial condition of each member." 288 F.Supp. at 462.

Similarly here, the depositions taken thus far reveal that the presentation made to each customer varied markedly. Account executives testified that they followed different practices in their dealings with different customers. For customers who showed greater interest or sophistication, the account executives would provide greater detail. To some customers, the account executives emphasized that SCC was being recommended by Merrill Lynch.[9] Account Executive Theodore Boots testified that some of his customers purchased SCC after a telephone conversation with him but other customers asked to be mailed supporting information. Some account executives sent copies of the current wire flash as supporting information routinely to all customers who purchased SCC and others sent wire flashes more selectively (Depositions; Wickham, pp. 124, 145; Boots, p. 92; Duffy, p. 126). Since all purchasers did not receive the same written materials, there will be individual questions of fact concerning what written misrepresentations were made to each customer in connection with each purchase.[10] There is conflicting testimony

---

9. For example, account executive William Zufall testified that his conversations varied from customer to customer: some of his customers were concerned with whether Merrill Lynch recommended the stock; others would request greater detail (Zufall Dep. p. 50). As a result, he gave some customers more specific information than he gave others (Zufall Dep. p. 100). Account executive Wilbur Marsh testified that, in his discussions with his clients, he did not, as a matter of course, discuss the matters discussed in the current QRQ, but if a client was interested in it, he would read it verbatim (March Dep. p. 88). Account executive John T.

Duffy testified regarding his use of the QRQ with his customers as follows:

"Well, as all people vary, and—in their interest, even though they were interested in speculative stocks, they are interested for different reasons . . . . [I]f it was short enough I would sometimes read the whole thing. Otherwise, I would use my own judgment as to selecting the portions that I thought were material. Some of it that was pertinent. All of it that was pertinent as of that date." (Duffy Dep. p. 127).

10. Illustrative of the individual factual contentions that will arise as to each Merrill Lynch

whether a copy of the current QRQ printout could be sent to customers; one account executive testified that he had done so (Boots EBT, p. 92), although others testified that firm policy prohibited this.

Most of the named plaintiffs in the *Mascolo* and *Reilly* actions testified that they first learned of SCC through their Merrill Lynch account executives and purchased the stock after consulting with these persons. However, some of the plaintiffs learned of SCC from sources outside of Merrill Lynch. Norman Brown, a plaintiff in the *Reilly* case knew of SCC from his own extensive involvement in the computer industry; Sandra Hamlin, another plaintiff in that action, learned of SCC from a fellow employee and called Merrill Lynch to inquire further. The class members who did learn of SCC from Merrill Lynch representatives did so under a variety of circumstances. Account Executive Richard Murphy testified that he discussed SCC at some investment seminars sponsored by Merrill Lynch in the Louisville, Kentucky area. Alton McLain, a plaintiff in the *Mascolo* action, had not previously had an account with Merrill Lynch when he was telephoned by a Merrill Lynch account executive touting SCC. Similarly, Norman Brown had been solicited by Merrill Lynch on several occasions without having an account with the firm until one persistent account executive succeeded in interesting him in purchasing 100 shares of SCC.

In their depositions, plaintiffs recalled a variety of representations that were made in the course of the presentations by their respective account executives. Dr. Mascolo

recalled that his wife's account executive had compared SCC favorably to Levin Townsend, a computer company stock that he owned then but sold to make his SCC purchase. Heffernan testified that the most significant and decisive representation made by his broker to him was that Research thought that SCC could be a "new IBM." [11] Wayne Cooper, a plaintiff in *Reilly*, testified that, when he made his first purchase of SCC on April 3, 1968 at 29¾, his account executive projected a possible price rise to 100.

In *Ingenito v. Bermec Corporation*, 376 F.Supp. 1154 (S.D.N.Y.1974), plaintiffs, investors in a tax-sheltered cattle breeding program, brought suit against Black Watch Farm, Inc. which was in the business of selling and maintaining interests in herds of Black Angus cattle for investors and had sold the investment to the plaintiffs. Plaintiffs sought class certification under Rule 23(b)(3), F.R.Civ.P. of their claims under the securities laws and for common law fraud. Plaintiffs contended that the use of a common sales technique raised a common issue, under Rule 10b–5, of whether Black Watch salesmen had made fraudulent misrepresentations. The sales technique involved an oral presentation by the salesman during the course of which he would complete a projection sheet of cash flow and depreciation. It was undisputed that in all presentations the projection sheets themselves had been uniform, although the figures entered thereon varied from one prospective purchaser to the next. The Court held that the use of these projection sheets did not raise issues common to the class

---

customer is the following conflicting testimony. Account executive Richard Murphy testified that in May 1969 it had been his practice to send SCC purchasers a copy of the Standard & Poor's information sheet and a copy of the then current Merrill Lynch wire flash. Max G. Baumgardner, a customer assigned to Murphy, and plaintiff in the *Baumgardner* action, testified that he did not receive any written materials in connection with his purchase in May 1969. However, prior to his next purchase of SCC shares on October 16, 1969, Baumgardner received from Murphy a copy of the June 9, 1969 wire flash and possibly some material that had not been prepared by Merrill Lynch.

11. Significantly, none of the voluminous Merrill Lynch materials produced by both sides in connection with this motion make comparisons between SCC and Levin Townsend or between SCC and IBM. Research Discussion No. 13 (Defendant's Exhibit C) includes a discussion of both SCC and IBM, but it makes no comparison between them. In sum, the promotional puff given to Heffernan by his Merrill Lynch account executive appears to be a product of that account executive's own analysis rather than that of Research's analysts.

because "the projection sheets did not contain common and uniform representations" and because

> " . . . a Black Watch salesman made his sales presentation in person. Consequently, not only the various figures embodied in the projection sheet, but also their context and significance would present individual issues of fact: the projection sheets were not self-explanatory." 376 F.Supp. at 1166–67.

In *Simon v. Merrill Lynch etc.*, 482 F.2d 880 (5th Cir.), *rehearing denied* 485 F.2d 687 (1973), a case factually related to those in the cases consolidated here, the court affirmed the denial of class treatment after trial on the merits of plaintiff's individual claim. There, the complaint alleged Rule 10b–5 violations and common law fraud predicated upon oral and written representations by Merrill Lynch. The court found that the trial record,

> " . . . indicating no standardized communications, plaintiff's primary reliance on oral statements made directly to him and his personal access to, if not information about, SCC's financial condition—demonstrates no 'common course of conduct' . . . . or *'common scheme'* . . . on the part of Merrill Lynch which would insure [plaintiff's] adequate representation of the purported class." 482 F.2d at 883 (Emphasis in original, citations omitted).

From the pre-trial discovery conducted to date, it now appears that the representations made to plaintiffs' purported class were neither uniform nor standardized. Viewed most favorably to the plaintiff, the evidence thus far adduced demonstrates that the QRQ and wire flash systems were a common source for the individual representations made to individual customers by their respective account executives.

Since an adverse judgment would bind the class, it is imperative, for this action to proceed as a class action, that all claims be sufficiently similar, and all representations by all account executives be sufficiently similar, that there is an assurance plaintiffs' claims are typical of the class. Among its other purposes, the class action, properly used, promotes judicial economy. This objective clearly cannot be achieved by amalgamating disparate claims in a single action. *Cf. Blackie v. Barrack,* 524 F.2d 891 [Current] CCH Fed.Sec.L.Rep. ¶ 95,312 at 98,582 n.18 (9th Cir. 1975).

Numerous reported cases have spoken in terms of the requirement that alleged fraudulent representations be standardized for a class action to lie. *See, e. g., Simon v. Merrill Lynch, supra; Davis v. Avco Corporation,* 371 F.Supp. 782, 792 (N.D.Ohio 1974); *Morris v. Burchard,* 51 F.R.D. 530 (S.D.N.Y.1971); *Moscarelli v. Stamm, supra.* Whether representations must be so standardized, or whether it is sufficient if they are merely similar, we find that the differences in the representations made, and in the circumstances under which the various representations were made in this case precludes class treatment of claims premised upon oral representations of Merrill Lynch account executives regarding SCC.[12]

A major concern in cases where different representations, oral or written, were made to the class had been that individual questions of reliance and damages were necessarily raised. It is now established that in cases involving omissions or non-disclosure, *Affiliated Ute Citizens v.*

12. To the extent that the foregoing discussion might be considered to differ from the analysis of Judge Tyler (61 F.R.D. 481, decided December 6, 1973) when this motion was first tendered, we are not bound by "law of the case." See, *Uniformed Sanitation Men Association, Inc. v. Commissioner of Sanitation,* 426 F.2d 619, 628 (2d Cir. 1970), *cert. denied,* 403 U.S. 917, 91 S.Ct. 2223, 29 L.Ed.2d 693 (1971); *GAF Corporation v. Circle Floor Co.,* 329 F.Supp. 823, 826 (S.D.N.Y.1971), *aff'd,* 463 F.2d 752 (2d

Cir. 1972), *cert. dismissed,* 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973). In view of the undeveloped state of the evidentiary record at that time, Judge Tyler's conclusions were necessarily preliminary. See *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738 (2d Cir. 1953). Finally, we note that even had a class been certified at that time, this Court would be empowered to make an order determining that further class proceedings would be improper. Rule 23(d), F.R.Civ.P.

*United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), or in cases of deception affecting integrity of the market, *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341 (2d Cir.), *cert. denied* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *Schlick v. Penn-Dixie Cement Corporation,* 507 F.2d 374 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), reliance may be presumed from the materiality of the omission, and individual proof of actual reliance is unnecessary. See Note, The Reliance Requirement in Private Actions Under SEC Rule 10b–5, 88 Harv.L.Rev. 584 (1975).

Reliance may remain a necessary element here if these plaintiffs' proof at trial reduces the claimed fraudulent course of conduct to a series of distinct misrepresentations. Assuming that reliance need not be demonstrated here, individual issues will remain: first, as to what representations or omissions occurred; second, whether the person making the representation did so fraudulently; third, whether what was misrepresented or omitted was material or whether a plaintiff's purchase of SCC may be said to have been caused by defendant's representations, omissions or course of conduct; and finally, individual measures of damages.

Even if this complaint states a claim of non-disclosure, the factual issue as to what statements were made to each customer who purchased SCC can be resolved only upon individual proof.

> "Omissions of material facts in oral communication is a matter which requires individual proof to the same extent as actual misstatements. The Court still must determine what was told to each purchaser . . . in order to establish what was omitted." *Goldstein v. Regal Crest, Inc., supra,* 689.

The language of Rule 10b–5 itself states that an actionable omission occurs when a person "omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Furthermore, "[t]he proof of omission as to

plaintiff A, who dealt with salesman X is not proof of material omissions as to plaintiff B, who dealt with salesman Y." *Ingenito v. Bermec Corp., supra,* at 1167.

There have been circumstances under which class treatment has been allowed although oral representations were made. In *Esplin v. Hirschi,* 402 F.2d 94 (10th Cir. 1968), *cert. denied* 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459 (1969), the court held, after trial on the merits, that plaintiffs' Rule 10b–5 claims were premised not upon oral misrepresentations, but upon "a complete failure to disclose any material facts— which default was necessarily common to all [purchasers]." 402 F.2d at 100. There, the court found that the evidence at trial demonstrated that additional affirmative misrepresentations made to some, but not all, members of plaintiffs' class were "merely cumulative" and that "the omissions which were the operative facts relied upon to show fraud were the same as to all investors." 402 F.2d at 100 n.12. *See also, Tober v. Charnita, Inc.,* 58 F.R.D. 74 (M.D. Pa.1973); *Bisgeier v. Fotomat Corporation,* 62 F.R.D. 113 (N.D.Ill.1972).

In the instant case, the complaint itself and the discovery conducted thus far reveal that the representations made, and omissions from those representations, are an integral part of the claimed fraud and cannot be treated as mere surplusage. In *Vernon J. Rockler & Co. v. Graphic Enterprises, Inc.,* 52 F.R.D. 335, 344 (D.Minn.1971), the court characterized the oral representations made to that class as "confirmations and assurances concerning misstatements and omissions already contained in" written materials.

Many of the cases which would appear to support plaintiffs' position as to class certification were decisions rendered early in their respective proceedings and therefore followed the procedure enunciated in *Kronenberg v. Hotel Governor Clinton, Inc.,* 41 F.R.D. 42 (S.D.N.Y.1966), of certifying the class initially but, if in the course of discovery it should appear that the allegedly fraudulent misrepresentations were varied, then the court would order the class allega-

tions stricken, pursuant to Rules 23(c)(1) and (d)(4), F.R.Civ.P. See *Davis v. Avco Corporation, supra; Vernon J. Rockler & Co. v. Graphic Enterprises, Inc., supra; Slade v. Shearson, Hammill & Co., Inc.,* 394 F.Supp. 946, CCH Fed.Sec.L.Rep. ¶ 94,329 (S.D.N.Y.1974). This procedure would be singularly inappropriate here as to those claims relating to representations regarding SCC since class determination has been deferred once already, and discovery on the issue of the similarity of the class' claims has proceeded to this relatively advanced stage, already revealing substantial variations and the predominance of individual questions of fact.

Having considered the difficulties posed by the allegations of oral representations, we turn to the individual claims for relief.

Count One alleges violations of the Act and rules thereunder predicated upon a failure of Research to obtain essential and material information upon which to base its recommendation to purchase SCC. Plaintiffs contend that Merrill Lynch and its employees breached their several duties of care and trust as described in *Hanly v. Securities and Exchange Commission,* 415 F.2d 589, 597 (2d Cir. 1969):

"[T]he standards by which the actions of [a broker-dealer] must be judged are strict. He cannot recommend a security unless there is an adequate and reasonable basis for such recommendation. He must disclose facts which he knows and those which are reasonably ascertainable. By his recommendation, he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation. Where the salesman lacks essential information about a security, he should disclose this as well as the risks which arise from this lack of information."

The essence of plaintiffs' claim here is that Merrill Lynch had a uniform recommendation in the QRQ system at any given time which was based upon some information, whether or not it was adequate to support the recommendation then in effect. This claim is not susceptible of class treatment since we have found that account executives utilized the Research materials differently: some used materials other than those provided by Research, and that the representations made to customers varied considerably; some may have reflected accurately Research's thinking at that moment and some may not. As to each transaction, the triers of fact will have to determine what representations were made, what basis there was for the representation at the time it was made, and what efforts Merrill Lynch and the individual account executives made to ascertain and verify the information given.[13]

Count Three alleges that from March 1, 1968 through November 21, 1969, defendant knew or in the exercise of due diligence should have known of material adverse facts concerning SCC's dire financial condition which it failed to disclose to its customers. More specifically, plaintiffs allege that by August 1, 1969,[14] Merrill Lynch's Underwriting Department knew that SCC desperately needed an infusion of capital to stay in business, and that SCC's existing balance sheet exhibited such a poor

---

**13.** Upon this motion, the Court is barred from consideration of the merits of the plaintiffs' claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). It must be stated, however, that our discussion here implies neither acceptance nor rejection of any claim pleaded here as a basis for recovery of damages by the named plaintiffs.

**14.** Plaintiffs have pleaded this claim in the most general terms without reference to any dates. Quite apart from the more general considerations discussed above, it should be noted that plaintiff Heffernan purchased his SCC shares on June 30, 1969. If August 1, 1969 is indeed the decisive date upon which Merrill Lynch acquired this adverse information, it would appear that he would not be a proper class representative since he is not a member of what might be termed the post-August 1, 1969 subclass. A still narrower definition of subclasses might prove necessary, since, in addition to other changes in Merrill Lynch's knowledge and representations previously noted, on October 16, 1969, Research changed its rating of SCC from # 1 to # 3, and Merrill Lynch ceased recommending purchase of SCC shares.

financial position that it could not satisfy Merrill Lynch's own requirements for providing investment banking services.

Plaintiffs rely upon *Slade v. Shearson, Hammill & Co., supra,* where class certification was granted on a similar claim of failure to disclose to brokerage customers adverse information that had come to the attention of the firm's underwriting department. Class certification was granted as the court held that, at the preliminary stage at which the issue was raised, plaintiffs could frame the issue as one of complete non-disclosure, without regard to the representations that were made. Upon the record before us in the instant case, it already appears that the failure to disclose this unspecified negative information cannot be divorced from the information provided by Research and the varying representations actually made by the account executives to the various purchasers.

In *Stull v. Baker,* [1973] CCH Fed.Sec.L. Rep. ¶ 94,227 (S.D.N.Y.1973), upon which plaintiffs also rely, the court limited the duration during which subclass members must have purchased to a period of approximately six weeks. There, plaintiff predicated his claim upon a failure to disclose a changing and developing sequence of events and the court noted:

> "Changes were frequently taking place . . . . If there was a duty of public disclosure, when that duty arose under the circumstances here is by no means free from doubt." *Id.,* at ¶ 94,928.

Class certification has been denied where there has been a series of alleged misrepresentations and omissions, and the plaintiff has failed to specify the material omissions which caused his losses so that it could be determined whether a common predicate for liability exists. *See, e. g., Robinson v. Penn Central Company,* 58 F.R.D. 436 (S.D. N.Y.1973); *Feldman v. Lifton,* [1974–75] 64 F.R.D. 539, CCH Fed.Sec.L.Rep. ¶ 94,870 (S.D.N.Y.1974).

In *Elkind v. Liggett & Myers, Inc.,* 66 F.R.D. 36 (S.D.N.Y.1975), class treatment was granted and the above cited cases distinguished because the facts not disclosed were specifically alleged, and the date on which the claimed duty to disclose arose was certain.

By contrast here, the plaintiffs merely allege that Merrill Lynch was in possession of information which reflected adversely upon SCC's financial condition and, throughout a nineteen month period, the defendant breached its duty of disclosure. Whatever common questions may be raised by this claim, it is plain that individual questions exist regarding the state of Merrill Lynch's knowledge as of any given date, the nature of the specific information that Merrill Lynch allegedly failed to disclose and a comparison of the alleged omissions with the representations actually made. The materiality of that information as of the respective purchase dates within this lengthy period, as well as individual issues of damages are likewise in issue on an individual basis.[15]

■ Count Four advances a concededly novel theory of 10b–5 liability in which it is alleged that Merrill Lynch account executives had "a continuing duty for a reasonable period of time to provide continuing investment advice" to its customers who were holders of SCC shares and that in its failure to perform this continuing obligation, Merrill Lynch failed to disclose adverse information regarding SCC. (Complaint, ¶¶ 36, 37). Upon this motion, we are not concerned with whether, even assuming that Merrill Lynch was in possession of such adverse information, it had an obligation to disclose this information to customers who were SCC shareholders, and whether the failure to make this disclosure states a claim under Rule 10b–5.[16] In a determina-

---

**15.** In specifying the individual questions raised in Count Three, the Court assumes that plaintiff is correct in characterizing his claim as one of omission and non-disclosure. If on trial it were to appear that there were affirmative misrepresentations, individual proof of reliance might also be required.

**16.** Nothing in our discussion of plaintiffs' claims in Count Four is to imply agreement or disagreement with its theoretical underpin-

tion of whether there is liability under plaintiffs' theory, this Court would have to determine many of the same issues as were discussed in connection with Count Three as well as reaching a determination of what a reasonable duration for this obligation would be, in view of the particular information that had come to Merrill Lynch's attention and the availability of this same information in alternative sources, particularly in materials which SCC may have sent to its shareholders.

■ Count Five alleges that Merrill Lynch failed to disclose to its customers that it was the dominant market-maker during the relevant time period, and that defendant failed to disclose prior to completion of the transaction that it acted as principal in the vast majority of its SCC transactions with its customers. Although the complaint alleges that Merrill Lynch failed to disclose that it was a market-maker in SCC, plaintiffs claim not to be seeking class representation on this claim by their motion here, and, in fact, concede that there appears to have been some, if not complete, disclosure of this fact. Plaintiffs contend that they may still seek class representation for their claim of Merrill Lynch's failure to disclose its transactions as principal. By the very nature of this claim, the plaintiff class would only include those customers who purchased in principal, rather than agency, transactions.

Merrill Lynch sent identical forms of confirmation slips to all of its customers. See Defendant's Exhibit I and Plaintiffs' General Appendix Exhibit 2. In a column enti-

tled "Symbol", a one-digit number might be entered. In confirmation slips sent to members of the proposed class, the number "7" appeared. On the reverse side of the confirmation slip, the number 7 in the Symbol column was explained: "Symbol 7 indicates that we have acted as principals (Over-the-Counter unless otherwise indicated)." In the column immediately to the left of the column denominated "Symbol", the number "8" appeared which is explained on the reverse side as signifying a transaction on the Over-the-Counter market. Plaintiffs contend that defendant's use of these confirmation slips was a fraudulent device and in violation of §§ 10(b), 11(d)(2) and 15(c), and Rules 10b–3, 10b–5, 15cl–2, 15cl–4 and 15cl–6 thereunder.[17]

Unlike the other misrepresentations and omissions alleged in the previous counts, "there are questions of . . . fact common to the class" as to this Count, namely, all Merrill Lynch customers received this form of confirmation slip. However, in addition to the uniform representations made in the confirmation slips, individual brokers made representations to individual customers relevant to the facts that Merrill Lynch was a market-maker in this security and that it was acting as principal ("dealer") with its customers. Also, the wire flashes, copies of which some customers received, stated: "This security is traded over the counter. . . . Merrill Lynch usually makes a market in this issue." (Defendant's Exhibit B). In *Simon v. Merrill Lynch, supra,* the district court found that Merrill Lynch's status as a market-maker

nings. *Pollak v. Eastman Dillon,* [1974–75] CCH Fed.Sec.L.Rep. ¶ 94,987 (S.D.N.Y.1975) rejected a similar contention since the alleged fraud was not in connection with the purchase or sale of a security. *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). Subsequent to the *Pollak* decision, the Supreme Court decided *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) which lends further support to the reasoning of *Pollak, supra.*

**17.** Rule 15cl–4(a) requires that the "broker or dealer, at or before the completion of each such transaction, gives or sends to

such customer written notification disclosing (1) whether he is acting as a broker for such customer, as a dealer for his own account, as a broker for some other person, or as a broker for both such customer and some other person. . . ."
The confirmation slip used by defendant in confirming these transactions appears similar to those commonly used in the brokerage industry to make the required disclosure. The common usage of this form of confirmation slip does not foreclose inquiry into the lawfulness of its use. See *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167, 1171 (2d Cir. 1970).

was adequately disclosed to that plaintiff in the wire flash that he received, and the Fifth Circuit held that this finding was not clearly erroneous.

■ Beyond doubt, it is not a fraudulent practice for a brokerage firm to act as a market-maker and to sell securities to its customers as a principal. The fraud, if any, lies in the failure of the broker to disclose that he is dealing as a principal under circumstances in which his customer may believe otherwise, and the consequent failure to disclose that the broker's interest may be adverse to that of his customer.

■ The cases involving damage claims by investors against their brokers for failure to make these disclosures have each examined carefully the factual context in which the claim arose. If the relationship between broker and customer has been premised on trust and confidence, formal disclosure may be inadequate and the broker may be held to a higher obligation to educate his client. *Chasins v. Smith, Barney & Co., Inc.,* 438 F.2d 1167 (2d Cir. 1970); *Cant v. A. G. Becker & Co., Inc.,* 374 F.Supp. 36 (N.D.Ill.1974). See also, *Taylor v. Smith, Barney & Co., Inc.,* 358 F.Supp. 892 (D.Utah 1973). Where the relationship between broker and customer resembles an arms-length commercial relationship and there has been no overreaching by the broker, the broker's duty of disclosure is less stringent. *Batchelor v. Legg & Co.,* 52 F.R.D. 553 (D.Md.1971). See also, *Architectural League v. Bartos,* 404 F.Supp. 304, [Current] CCH Fed.Sec.L.Rep. ¶ 95,329 (S.D.N.Y.1975).

■ In determining whether a broker has assumed and discharged the obligations of a fiduciary, relevant factors would include the prior course of conduct between the parties, the extent to which the broker has held himself out as an investment adviser and confidant, the degree of the customer's dependence on the broker for advice, the sophistication of the investor, whether the investor was familiar with the operations of the O–T–C market and principal transactions, the number of other market-makers at the time of the transaction, the fairness of the price, and the disclosure actually made. See generally, 3 L. Loss, Securities Regulation 1500–08 (1961).

■ Since the triers of fact must undertake this individualized inquiry into the nature of the relationship between broker and customer, it is plain that the individual questions of law and fact will predominate.

There are varying degrees of sophistication evident among the named plaintiffs in the *Mascolo* and *Reilly* actions. Plaintiff Kenneth F. Reilly knew that Merrill Lynch was making a market in SCC and understood that this meant that Merrill Lynch was buying and selling this security (Reilly EBT, pp. 12, 30). Plaintiff Norman Brown testified that his account executive told him that Merrill Lynch itself "had taken a position in this stock" meaning that the brokerage firm itself was investing in SCC, but did not say that Merrill Lynch was making a market (Brown EBT, pp. 40–43). Plaintiff Alton McLain, an investor who had previously purchased O–T–C issues, erroneously believed that SCC was listed on the New York or American Stock Exchanges, and that he had purchased his shares in an agency transaction (McLain EBT, pp. 36–45). Factors such as the degree of investor dependence on the broker's advice and familiarity with O–T–C and principal transactions are likely to vary considerably. In sum, this claim is not susceptible of class litigation because individual questions of fact and law predominate.

Count Six alleges that Merrill Lynch account executives failed to disclose that Merrill Lynch and its account executives derived pecuniary benefits from the sale of O–T–C stocks in which Merrill Lynch made a market, such as SCC, that were not available to it in other transactions. Plaintiffs contend that Merrill Lynch received approximately double compensation in transactions in these stocks. Merrill Lynch received the spread between the Bid and Asked quotations, as it would in any transaction in which it acted as principal. Plaintiffs contend that Merrill Lynch derived this compensation risk-free because each

day the Merrill Lynch trader "went flat", or sold as many shares as were purchased. The double compensation occurred because in addition to the spread, Merrill Lynch charged its customers a "service charge" equivalent to its customary commission on agency transactions, which appeared on its confirmation slips under the heading "Commission or Charge." [18]

Plaintiffs further contend that the individual account executives also derived additional benefits from SCC purchases. These Merrill Lynch employees were paid a salary. In addition, account executives received "adjusted compensation" on a semi-annual basis computed upon a system of production credits. The award of production credits rested within the discretion of Merrill Lynch supervisory personnel, and one factor considered in awarding credit was the gross revenue which that account executive generated for the firm. It is alleged that as an incentive to generate transactions in O-T-C securities for which it was making a market, Merrill Lynch awarded a higher number of production credits to its account executives than were offered for other transactions.[19]

Plaintiff contends that this information was material and that it was withheld from the entire class. Some account executives testified that they informed their customers orally of the additional compensation earned by Merrill Lynch and/or the incentive to the brokers. John T. Duffy testified that he told one of his fifteen or twenty customers who purchased SCC, a customer with whom he had a close relationship, that he received a higher production credit on transactions in which defendant acted as principal (Duffy Dep. pp. 116–17). Charles D. Kirkham testified that he informed some of his customers, but most he did not (Kirkham Dep. p. 621. See also Wickham Dep. pp. 78–94). William H. Zufall, II testified that he did not discuss his production credits with his customers because he did not believe that this was relevant to their investment decisions (Zufall Dep. p. 110. See also Boots Dep. pp. 127–28).

This claim is susceptible of class litigation. Issues common to the class are whether Merrill Lynch received higher compensation on transactions in O–T–C securities for which it made a market, whether account executives received higher compensation on such transactions, whether either of these compensation plans, considered separately or together, was a scheme or artifice to defraud, or whether failing to inform customers of these policies was the omission of a material fact. See *Barthe v. Rizzo,* 384 F.Supp. 1063 (S.D.N.Y.1974).

Defendant contends that production credits are awarded to account executives on the basis of numerous criteria reflecting numerous aspects of the quality of the account executive's work and not merely the dollar volume of all transactions, or any single form of transaction. Defendant further contends that the payment of adjusted compensation was discretionary and that account executives did not have a vested right to this compensation. These contentions, if true, will be relevant to the merits of the claim but, in any event, are beyond the scope of our inquiry here.

Class treatment will not be barred here although there will be the individual issues of whether disclosure was made to a particular customer and that customer's measure of damages. See *Jackson v. Bache & Co.,* 381 F.Supp. 71 (N.D.Cal.1974). Unlike

---

**18.** Plaintiffs contend that this service charge, appearing as it does under "Commission or Charge" was another device by which Merrill Lynch concealed or misrepresented its status as principal in the transaction, since the inclusion of a charge under this heading would lead a reasonable customer to believe he had effected an agency transaction, and was being charged a brokerage commission.

**19.** Account executive William Zufall testified that production credits on the purchase of an O–T–C issue for which defendant was making a market were one and three-quarters times the amount awarded for a transaction of a similar dollar amount on a New York Stock Exchange transaction (Zufall Dep. pp. 109–10). Account executive Charles D. Kirkham testified that it was one and three-quarters times on the buy side and one and one-quarter on the sell side of such transaction (Kirkham Dep. p. 622).

omissions or misrepresentations regarding SCC itself, the claimed representations made to investors concerning Merrill Lynch's and/or its account executives' financial self-interest are not as likely to vary greatly among brokers or from one date in the marketing period to the next. The individual issues here are similar to the individual issues of reliance and damages that ordinarily remain in a class adjudication of fraud claims premised on misrepresentations. See *Green v. Wolf Corporation, supra*; *Korn v. Franchard Corporation, supra*.

Accordingly, the *Mascolo* plaintiffs may proceed as representatives of the class as to the claim for relief stated in Count Six of their complaint. The class will be comprised of all Merrill Lynch customers who purchased SCC shares in principal transactions between the date on which Merrill Lynch commenced making a market in that issue, and November 21, 1969. In all other respects the motion to declare a class is denied.

Settle order on ten (10) days notice in the *Mascolo* action, which shall contain appropriate provisions for notice, and a form of proposed notice to the class, pursuant to Rule 23(d)(2), F.R.Civ.P.

### MEMORANDUM DECISION ON REARGUMENT

On April 28, 1976, the Court heard reargument upon plaintiffs' motion, of our prior ruling that Count 1 was not susceptible of being litigated as a class action, and upon defendant's motion also heard reargument of our order certifying plaintiffs' class as to the claim pleaded in Count 6. Plaintiffs also moved, pursuant to Rule 15(a), F.R. Civ.P. for leave to amend Count 3 and for class certification of the claims as amended. For reasons hereinafter stated, the Court adheres to its Memorandum Decision dated March 22, 1976, and denies plaintiffs leave further to amend their complaint. Familiarity with that decision is assumed.

Plaintiffs contend that the Court erroneously construed the claim stated in Count 1, in finding that there are a variety of individual issues of fact and that these individual issues predominate. Plaintiffs describe the claim asserted in Count 1 as being founded on a single uniform misrepresentation and a single uniform omission. It is claimed that Merrill Lynch's recommendation itself was a misrepresentation made uniformly to all putative class members. The claimed omission is Merrill Lynch's failure to disclose that its recommendation to purchase common stock of Scientific Control Corporation ("SCC") was being made without a reasonable and adequate basis. Plaintiffs contend that apart from any affirmative misrepresentations, which account executives may have made to individual class members, the recommendation itself and the failure to disclose the inadequate basis for that recommendation operated as a fraud, uniformly, as to the entire class. In accord with these contentions, plaintiffs have offered to include in their notice to absent class members the admonition that this suit does not encompass individual affirmative misrepresentations and that if a class member wishes to prosecute a claim premised on affirmative misrepresentations, he may elect not to be included in the class.

In our initial decision, we found that different account executives made different oral representations at different times. We further found that the failure to disclose particular facts could not be divorced from the representations actually made. In recommending SCC to their customers, account executives gave reasons for Merrill Lynch's favorable recommendation. According to plaintiffs' theory, the account executives gave as reasons for the recommendation that information contained in the text of the QRQ report prepared by Merrill Lynch's Research Department ("Research").

Whether the recommendation was fraudulently made and whether the reasons for recommending SCC were adequately investigated and reasonably supported in fact necessarily requires inquiry into the representations made.

Upon reargument, plaintiffs submitted excerpts from the testimony of twenty-four (24) account executives who have appeared and testified in the continuing Securities and Exchange Commission administrative proceedings [*In the Matter of Merrill Lynch etc.*, File No. 3–4329], since plaintiffs' motion for class certification was last before the Court. Plaintiffs contend that the theory of liability propounded in Count 1 in all respects tracks the SEC administrative proceeding.

These brief excerpts support further our conclusion that individual issues of fact predominate. During the course of their testimony, various account executives were confronted with testimony of their customers that they had made specific representations. They denied making the alleged representations. See Exhibits N, Q, R, S and U to Affidavit of R. Alan Stotsenburg, Esq., sworn to April 16, 1976. The trier of fact will be required to ascertain what representations were made, since these were the expressed bases for recommending the purchase of SCC.

In our prior decision, we delineated as individual issues under Count 1 what representations were made; whether the representations were derived from materials prepared by Research; whether the representations had an adequate and reasonable basis; and what efforts, if any, individual account executives made to ascertain and verify the information given.

These individual issues remain just that. They cannot be papered over and disguised so as to appear as a single issue. In the context of the facts already developed upon this record, it does not appear possible to isolate the recommendation itself from the representations that accompanied it. In addition, customers have testified concerning representations which, if proven, may well have been false or omitted in stating material facts "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Rule 10b–5; 17 C.F.R. § 240.-10(b)–5. These claims cannot be pursued in this proposed class action. If an absent class member failed to recover upon his claim here, or recovered in settlement an amount the class member believes insufficient to compensate him for his losses, it is not clear that any judgment in this action would bar further litigation of his claim.

We need not go so far as to determine that plaintiffs' proposed isolation of the recommendation would result in an impermissible splitting of the cause of action. However, in determining whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy," this artificial isolation of the recommendation indicates that a class action so limited may be inefficient and unfair to absent class members.

Defendant contends that, in granting plaintiffs' motion to prosecute Count 6 on behalf of the class, the Court overlooked certain facts in the record and controlling decisions.

Defendant contends that the Court did not give adequate consideration to the proof adduced on discovery thus far that, contrary to plaintiffs' allegation, Merrill Lynch did not engage in risk-free transactions in SCC by "going flat," or selling as many shares as were purchased. Such evidence as there is that this was not the Merrill Lynch policy is addressed to the merits of the claim and is beyond our immediate concern. Defendant further contends that any analysis of Merrill Lynch's trading strategy, including whether there was a policy of "going flat," would necessitate a trade by trade analysis. At trial, plaintiffs will have to prove that Merrill Lynch derived double compensation on sales of SCC shares and failed to disclose this. Plaintiffs may be able to demonstrate this persuasively by showing some consistent pattern to Merrill Lynch's trading without showing that every sales transaction had a corresponding purchase transaction or vice versa. To be of any significance, a pattern of trading would have to be demonstrated from which the trier of fact might infer that Merrill Lynch pursued a policy not to assume any risk in trading SCC by holding a long or short position. The pattern need

not be demonstrated trade by trade, although if what is shown is an ever-changing position, sometimes long and sometimes short, then Merrill Lynch would have been assuming some risk in its transactions.

Merrill Lynch further contends that since it made no contemporaneous effort to pair purchase and sale prices, it would not have been possible to disclose its compensation to its customers. Again, this issue is addressed to the merits of the claim. If Merrill Lynch were not engaging in a practice whereby its compensation was greater in SCC than in stocks for which it was not making a market, then there would be no incentive for account executives to promote sales of SCC for the benefit of Merrill Lynch. If a pattern of additional compensation emerged, the exact amount of compensation still might not be a material fact requiring disclosure, if customers were aware that Merrill Lynch had some additional incentive to sell SCC shares.

Defendant next contends that, contrary to plaintiffs' allegations, account executives did not receive additional income in the form of "adjusted compensation" based upon their sales of O–T–C stocks for which Merrill Lynch was making a market. In response to plaintiffs' initial motion, defendant contended that the award of production credits toward adjusted compensation was a matter within the discretion of Merrill Lynch supervisory personnel which was made after a consideration of a variety of factors. Defendant contends that the award of adjusted compensation was not centrally administered pursuant to uniform criteria. It is difficult for this Court to conceive that Merrill Lynch had a system of compensation, providing a significant portion of the wages of its account executives which was wholly arbitrary. Again, defendant's arguments are addressed to the merits. If, as defendant contends, production credits were awarded based upon diverse criteria, those criteria may be identified. Plaintiffs' contention may be without basis in fact but the merits of the claim cannot be reached in our determination of class action suitability.

Defendant next contends that, as we observed in regard to Count 5, the trier of fact would be required to determine the nature of the relationship between the account executive and his customer to determine the extent of the duty to disclose. As a general matter, the securities laws do not distinguish between sophisticated and unsophisticated investors; both are entitled to the protections of its disclosure and anti-fraud provisions. See, e. g., *Stier v. Smith*, 473 F.2d 1205, 1207 (5th Cir. 1973); *Welch Foods, Inc. v. Goldman, Sachs & Co.*, 398 F.Supp. 1393, 1398–99 (S.D.N.Y.1974); *Newman v. Shearson, Hammill & Co., Incorporated*, 383 F.Supp. 265 (W.D.Tex.1974).

Defendant asserts that, in finding Count 6 susceptible of class litigation without recognition of individual account executive-customer relationships, the Court found as a matter of law that the omissions, if there were any, were material. We do not so regard that ruling. Materiality remains an issue for determination upon a full trial record.

In *TSC Industries, Inc. v. Northway, Inc.*, —— U.S. ——, 96 S.Ct. 2126, 48 L.Ed.2d 757, 44 U.S.L.W. 4852 (1976), the Supreme Court defined the element of materiality. In the context of a claim asserted under § 14(a) of the Securities Exchange Act of 1934, the Court stated (p. ——, 96 S.Ct. p. 2133, p. 4855):

"[A]n omitted fact is material if there is a substantial likelihood that a *reasonable* shareholder would consider it important in deciding how to vote. . . . It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the *reasonable investor* to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the *reasonable* shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the *reasonable investor* as having significantly altered the 'total mix' of

information made available." (Emphasis added).

There is no question but that the appropriate standard of materiality is objective, and not subjective.

Defendant contends that the class, as defined in our prior decision, includes customers who purchased SCC under a variety of circumstances which do not raise common factual issues. Specifically, the class includes persons who were solicited by Merrill Lynch, customers who purchased SCC after discussions with account executives, and persons who placed unsolicited purchase orders without any encouragement from Merrill Lynch. Defendant contends that the issues here raised will necessitate individual inquiry into the circumstances of each transaction.

Defendant's contention, in this regard, is not without merit. Even if there was a higher level of compensation to Merrill Lynch or its account executives and this was not disclosed, it still may not have been material or caused the purchase transaction of those customers for whom Merrill Lynch merely acted as an "order taker." See generally, *Schlick v. Penn-Dixie Cement Corporation*, 507 F.2d 374, 380 (2d Cir. 1974). At present the customers so situated cannot be identified, nor can it be ascertained how many members of the class are so situated.

■ In our prior decision, we concluded that common issues of fact and law predominated in Count 6 although individual issues remain for separate trial. Whether Merrill Lynch was a passive "order taker" in a particular SCC transaction is an individual issue of fact to be separately determined. The existence of this individual issue does not alter our conclusion that common issues predominate, nor does it prevent class litigation of the common issues. The individual issue of transaction causation raised here is similar to the individual issues of reliance that ordinarily remain in class claims involving misrepresentations. See, e. g., *Green v. Wolf Corporation*, 406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

Determination of this individual issue will abide the determination of issues common to the class.

Finally, plaintiffs seek leave to amend Count 3 of the second amended complaint, following which they would seek certification for Count 3 to proceed as a class action. In an affidavit in support of this motion, plaintiffs' counsel concedes that amendment is sought "in response to reasons advanced by the Court in its opinion . . . denying class action certification on Count Three." (Affidavit of R. Alan Stotsenburg, Esq., sworn to April 16, 1976, ¶ 3). By their proposed amendment, plaintiffs seek to narrow the nineteen month time period alleged in Count 3 and create two subclasses, one of customers who purchased between August 1, 1969 and October 16, 1969, and the other of purchasers from October 20, 1969 through November 21, 1969.

We are indeed conscious of the letter and spirit of Rule 15(a), F.R.Civ.P., that leave to amend "be freely given when justice so requires." We have been reminded that

"[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.—the leave should, as the rules require, be 'freely given'." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

There exist countervailing considerations which in a case may outweigh the policy of liberal amendment. One such consideration is the expeditious and orderly processing of complex litigation.

■ The *Mascolo* complaint was first filed in this Court on August 2, 1972, and has already undergone two amendments. The purpose of this latest proposal to amend is merely to fashion this litigation in such manner as to enhance its class action aspects. The Court has not found that the Count as pleaded fails to state a claim, only that it is not susceptible of class litigation.

There comes a time, when after nearly four years of litigation, there must be an end to the amending process. As long ago as 1974, Judge Tyler, to whom this case was initially assigned, expressed extreme reluctance to tolerate further delay by amendment. On July 26, 1974, Judge Tyler told counsel that he would permit this second amended complaint "on condition, however, that this is going to be the complaint which you rely on, and I want an affidavit coupled with copies of the other complaint with a statement from all three [counsel in this case and *Reilly*] that this is what you mean." (Transcript, July 26, 1974, p. 12). In compliance with Judge Tyler's directions, counsel filed affidavits on October 24, 1974 representing to the Court an intent to rely on the second amended complaint, and proceed to trial thereon.

Because of the inordinate delays in this case, traceable in substantial measure to plaintiffs, Judge Tyler granted leave to amend conditioned on the representation that the second amended complaint would be the final amendment. While we are not bound by the exercise of discretion of Judge Tyler almost two years ago, we do believe, as a matter of discretion, that no further amendment should be permitted here merely to enhance the class action aspect of this litigation. Although the proposed amendments are subsumed within the factual theories alleged in the second amended complaint, this belated amendment after extensive discovery will further delay trial preparation.

We express no opinion whether, if leave to file this proposed amended pleading were granted, class certification would follow as of course.

Plaintiffs' motion for leave to amend their complaint further is denied. No further amendment will be permitted except as is necessary to conform the pleadings to the proof, either as elicited in discovery or at trial.

Our prior decision is adhered to on reargument, except as modified herein. Plaintiffs' motion for class certification of the claim in Count 1 is denied and plaintiffs' motion for class certification of the claim in Count 6 is granted.

Settle order on ten (10) days notice in the *Mascolo* action, which shall contain appropriate provisions for notice, and a form of proposed notice to the class, pursuant to Rule 23(d)(2), F.R.Civ.P.