G. Martin **BLAKELY** et al., Plaintiffs,

v.

Philip J. **LISAC** et al., Defendants.

Civ. No. 70–377.

United States District Court,
D. Oregon.
Nov. 28, 1972.

See also D.C., 357 F.Supp. 267.

Henry A. Carey, Jr., Carey & Stoll, Portland, Or., for plaintiffs.

Barnes H. Ellis, Henry H. Hewitt, Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for defendant Philip J. Lisac.

Roger Tilbury and Theodore S. Bloom, Portland, Or., for defendant Joseph M. Schmitz.

Frank J. Van Dyke, Van Dyke, DuBay & Robertson, Medford, Or., for defendant Ralph M. Cook.

Deich, Deich & Hinton, Portland, Or., for defendants Ralph M. Cook and James C. Youde.

Roland F. Banks, Jr., Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for defendants Robert N. Gygi and Bruce Engel.

Robert L. Myers, Shuler, Rankin, Myers & Walsh, Portland, Or., for defendant June S. Jones Co.

Alfred H. Stoloff, James K. Buell, Phillips, Coughlin, Buell & Phillips, Portland, Or., for defendant Howard Cheifetz.

James H. Jordan, Weatherford, Thompson, Horton & Jordan, Albany, Or., for defendant James C. Youde.

Dennis Lindsay and Robert Conklin, Lindsay, Nahstoll, Hart, Dafoe & Krause, Portland, Or., for defendant Weir H. Owens.

Marvin S. Nepom, Portland, Or., for defendant Herman Goldberg.

## OPINION

SOLOMON, District Judge:

Plaintiffs are stockholders of Cryo-Freeze Products Co. (Cryo-Freeze or Company), an Oregon corporation. They have filed this class action, in which they seek to represent all Cryo-Freeze stockholders, to obtain relief under Section 10(b) of the Securities Exchange Act of 1934 (Act), 15 U.S.C. § 78j(b) and Rule 10b-5 (17 C.F.R. 240.-10b-5). The defendants are the officers, directors, underwriters and financial and technical advisers of Cryo-Freeze.

Plaintiffs contend that through various oral and written misrepresentations and omissions, they were fraudulently induced to purchase shares of stock in Cryo-Freeze.

On September 22, 1970, plaintiffs were authorized to continue this case as a class action. The defendants ask for a reconsideration of this order. As a group, the defendants deny that any material misrepresentations were made. Each asserts that he did not know, and in the exercise of reasonable care could not have known that material misrepresentations were made to the public.

This case is now before the Court on the propriety of the class action and on whether the defendants, or any of them, made or are responsible for misrepresentations or other conduct made actionable by Section 10(b) and Rule 10b-5. The issues of reliance and damages are reserved.

Cryo-Freeze was organized by defendant Philip Lisac in 1961 under the name of Philco, Inc. Philco was engaged in the distribution of frozen meats and meat products.

Fresh meat deteriorates when it is taken home by a consumer and frozen. In 1967, Lisac learned of the nitrogen process to rapidly freeze meats with little decay. He became interested in marketing the frozen meats in familiar cuts, like steaks and roasts, to the retail trade. These meats would be displayed in a frozen food bin at supermarkets.

To take advantage of this market, Lisac decided that Philco would freeze meats, using the nitrogen process, but he needed money to build a new plant and purchase new equipment. Lisac met with Herman Goldberg, who explained to him how a public offering could be made, and he referred Lisac to defendant Robert Gygi, an attorney experienced in local public offerings. For this advice Goldberg received a $2,500 fee.

In October and November, 1967, Lisac and Gygi planned the public offering. They met individually with Goldberg, Joseph Schmitz, who was Philco's sales manager, and Howard Cheifetz, an engineer for Air Reduction Company, the company that was working on the production of a nitrogen freezing tunnel.

Gygi prepared an investment memorandum to secure an underwriter. The memorandum was presented by Gygi to one of his clients, Richard Deal, who had recently organized Pacific Securities

Company. Deal agreed that Pacific would underwrite this issue as its first public offering. The underwriting agreement, the proposed prospectus, the new articles of incorporation with the change of name from Philco to Cryo-Freeze, and new by-laws were all approved by the existing directors and stockholders before the public offering. The prospectus listed Lisac as president and director; Weir Owens, the accountant for Philco, as secretary; and both Schmitz and Gygi as directors. It also showed that Goldberg had received $2,500 for financial advisory services and that Cheifetz was serving as a technical advisor to the company.

The offering prospectus was dated December 18, 1967. A supplement dated January 8, 1968, listed Ralph M. Cook and James G. Youde, who were elected on January 4, 1968, as outside directors. The public offering commenced December 31, 1967, and concluded about January 23, 1968.

During the public offering, several local investment firms, including June S. Jones Co. (Jones), received unsolicited requests from their customers for Cryo-Freeze stock. To facilitate these sales, Jones entered into a selling arrangement with Pacific Securities. After selling approximately 70,000 shares, Jones, a member of the National Association of Securities Dealers (NASD), learned that Pacific was not a member of this association. NASD rules did not permit a member to enter into a selling arrangement with a non-member. To avoid this conflict, Jones, with the permission of the Oregon Corporation Commissioner, entered into an agreement with Pacific by which Jones became an underwriter for the 70,000 shares of Cryo-Freeze stock. Although this agreement was entered into on January 26, 1968, it was back-dated to December 28, 1967.

The price of the stock during the initial offering was $1 a share. The price per share rose steadily until it reached a high of nearly $5 in January, 1969. In February, 1969, the price began to decline; by the end of 1969, the stock was worthless.

### THE CLASS ACTION

The named plaintiffs seek to represent all the Cryo-Freeze stockholders. The defendants assert that the plaintiffs have failed to meet the requirement that ". . . questions of law and fact common to the members of the class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)3. They contend that many of the alleged misrepresentations were non-standard oral statements made to individual purchasers of Cryo-Freeze stock.

Plaintiff Jaffe bought shares of Cryo-Freeze after he was solicited by a salesman for American Western Securities Company, a local securities dealer that is not a party to these proceedings. Plaintiff Muller is a friend of the Lisac family. He bought his stock after talking with Lisac. Neither Jaffe nor Muller received or considered any written material.

■ A class action is not appropriate when non-standard oral misrepresentations are the basis of the fraud. Morris v. Burchard, 51 F.R.D. 530 (S.D.N.Y. 1971); Moscarelli v. Stamm, 288 F. Supp. 453 (E.D.N.Y.1968). The plaintiffs may maintain a class action on behalf of those stockholders who relied on standardized misrepresentations made to a sizable number of stockholders. Green v. Wolf, 406 F.2d 291 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); Harris v. Palm Springs Alpine Estates, 329 F.2d 909 (9th Cir. 1964) (decided under the old Rule 23).

■ Plaintiff Kolousek testified that he purchased his shares of Cryo-Freeze after carefully studying the prospectus. Plaintiff Blakely bought additional shares of stock after he received various company reports and after he read a newspaper article by Gerry Pratt in the *Oregonian*.

Misrepresentations which appear in a prospectus, a financial statement or a

company report are typical examples of standardized misrepresentations which satisfy the requirements of Fed.R.Civ.P. 23(b)3. See *Moscarelli, supra,* and Green v. Wolf, *supra.* This action may proceed as a class action with plaintiffs Kolousek and Blakely representing a class of Cryo-Freeze shareholders who purchased in reliance on the offering prospectus; the March 20, 1968 Report; the 1968 Annual Report; the April 1969 Report; or the Pratt article.

■ Kolousek is the only named plaintiff who purchased stock in reliance on the offering prospectus. Defendants challenge him as an adequate representative for any class of stockholders. Kolousek bought 1,000 shares on the original offering for $1,000. Later, he sold 400 shares for $1,700. Even though he retained 600 shares which became worthless, he made a net profit of $700. Defendants assert that it would be "bad policy" to permit an individual to sue in a representative capacity under Rule 10b–5 when he has made an overall profit on the stock which he claims he was fraudulently induced to buy. I disagree.

Even if because of this profit an individual defense to Kolousek's claim might be asserted, that would not disqualify him from representing the class. Lamb v. United Security Life Company, 59 F.R.D. 44 (S.D.Iowa C.D., 1972); De-Milia v. Cybernetics International Corp., CCH Fed.Sec.L.Rep. ¶ 93,386 (S.D.N. Y.1972); Mersay v. First Republic Corp. of America, 43 F.R.D. 465 (S.D. N.Y.1968). Defendants do not contend that Kolousek relied on undisclosed inside information when he sold the 400 shares, and there is nothing in his position which would make his interest antagonistic to the remaining members of the class. I find that Kolousek may represent a class of stockholders who purchased Cryo-Freeze stock in reliance on the prospectus.

## THE PROSPECTUS

The prospectus was prepared by Gygi and Lisac. Cheifetz supplied them with technical information, and Owens provided them with financial statements. The prospectus contained a number of misrepresentations:

1. The financial statement did not adequately show the company's liability on worthless leased equipment. In 1965, Philco contracted with Designs Unlimited to plan and manufacture three pieces of specialized equipment for Philco. Philco financed this project through a sale and leaseback of the equipment with Industrial Leasing. Design produced only one machine, which could not be used. In May, 1966, Lisac wrote the Multnomah County Assessor that the equipment was "worth only salvage." Philco filed an action against Designs Unlimited, and on October 3, 1967, obtained a judgment by confession against Designs for $35,614.80. This judgment was uncollectible because Designs had no assets and was out of business. However, Philco remained liable to Industrial Leasing for the balance of the instalments on these three pieces of equipment, which amounted to $24,983.

■ This liability to Industrial Leasing was set out in a footnote to the balance sheet, which read:

"The Company's automated machinery under development was financed under a lease with option to purchase with rentals of $713 per month. The Company can repurchase the equipment for the unpaid rental plus $1,426. No value is given to the equipment or the $19,000 in development costs on the balance sheet except the prepaid equipment lease deposit. The balance due on the lease was $24,983 at October 28, 1967."

Although liabilities of this kind may properly be set out in a footnote if the footnote adequately discloses the liability, here the footnote was ambiguous and misleading. It did not show that the $24,983 was owed for one piece of worthless equipment and two pieces of equipment that were never manufactured. Not only did the footnote fail to mention that the judgment obtained against Designs was probably uncollecti-

ble, but it also incorrectly implied that the equipment was actively under development at the time of the prospectus.

2. The transaction was referred to in another section of the prospectus, which read, "the Company has under development two new machines which should enable it to automate the processing of chopped steaks . . . The Company has expended about $19,000 on the project and it will require up to an additional $25,000 for completion." It recited that the equipment is financed on a lease by which the Company pays $713 a month with an option to purchase.

This statement was intended to and did convey the false impression that the Company had virtually developed two new machines that would significantly increase efficiency and reduce costs.

3. Under the heading of "The Offering and Proceeds," the following chart appeared:

"To the extent of the net proceed received, the Company will utilize the funds for the following purposes:

| | |
|---|---|
| Liquid nitrogen tunnel ........... | $ 28,000 |
| Land acquisition and new building ... | 100,000 |
| Frozen fresh meat cut inventory and receivables ................ | 30,000 |
| Inventory of new items and receivables ................... | 30,000 |
| Seattle inventory and receivables .... | 50,000 |
| Breaded pattie equipment ......... | 25,000 |
| Automated equipment for chopped steaks ...................... | 25,000 |
| | $288,000" |

The prospectus contained a statement that the nitrogen freezing tunnel would cost "about $28,000"; that a new building would cost "about $100,000".

The defendants have attempted to show that there was a reasonable basis for these and other figures in the prospectus even though the actual expenditures exceeded the proposed expenditures by almost 40 per cent. They contend that the expenditure of additional money might be a basis for an action for a breach of a fiduciary duty but not for an action under Rule 10b–5. I reject this narrow reading of the rule, and, in addition, I find that the amounts

listed were made without an adequate basis and created the false impression that with the $288,000 secured from the public offering, the company could establish a properly financed nitrogen freezing business. I believe that 10b–5 is applicable when, either through undue optimism or negligence, the proposed spending is underestimated by almost 40 per cent in an offering prospectus. This is particularly true when the Company's balance sheet showed that it had less than $7,000 in working capital and the ratio of current assets to current liabilities was 1.1 to 1.

4. The prospectus was also misleading when it failed to mention serious marketing problems with frozen meats. The prospectus discussed a rapid and extensive shift from fresh to frozen meat but failed to mention that all meat turns grey when exposed to light. This problem is particularly acute with frozen meat because of its longer intended shelf-life. One possible solution is to display the meat in non-transparent packages. However, there is strong consumer resistance to the purchase of meats wrapped in this manner.

The discoloration problem was so serious that it cast doubt upon the enthusiastic remarks about the growing market.

I find the misrepresentations of Cryo-Freeze's financial condition to be material misrepresentations in connection with the purchase or sale of securities. SEC v. Texas Gulf Sulphur, 401 F.2d 833 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968), cert. denied, 395 U. S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969). I also find that the failure to mention the marketing problem rendered the assertions in the prospectus so incomplete that they were misleading. *Texas Gulf Sulphur, supra.*

### THE MARCH 20, 1968 REPORT

This report to the stockholders stated that "profits are now running

$2,000 per month." The statement was false. A balance sheet issued later showed that between January 1, 1968, and March 30, 1968, the Company suffered a net loss of over $6,000. The loss for 1968 was more than $90,000. The defendants assert that the figures in the report were incorrect because there was no financial statement available when the report was published. If so, there was no basis for claiming profits of $2,000 a month. This reckless statement is actionable under 10b-5. Financial Industrial Fund, Inc. v. McDonnell Douglas Corp., CCH Fed.Sec.L.Rep. ¶ 93,004 (D.Colo.1971).

## THE 1968 ANNUAL REPORT

██ This report, distributed in January, 1969, contains an unaudited financial statement dated June 30, 1968; it shows a net loss of approximately $5,000. From June 30, 1968, to December 31, 1968, the Company suffered losses of approximately $90,000. From June 30, 1968, to late September, 1968, the Company lost more than $32,000. The failure of the Annual Report to warn stockholders of the losses in the last half of 1968 was a material omission.

## THE APRIL 1969—INTERIM REPORT

This report failed to disclose the heavy losses suffered in 1968 and the first quarter of 1969. It predicted sales of $4,000,000 in 1969 when the sales for 1969 were about $830,000, and it predicted a profit for the year 1969, a year in which the Company lost about $250,000. There was no basis for these predictions. R. A. Holman & Co. v. SEC, 366 F.2d 446 (2d Cir. 1966).

## NEWSPAPER ARTICLES

██ An *Oregonian* article appeared in May, 1969. It contained many of the statements that appeared in the April, 1969 Interim Report. The article predicted sales of $4,000,000 and a profit for the year. There was no mention of any losses for 1968. Lisac stated that the article accurately represented his statements to Gerry Pratt, the author of the article.

██ Misrepresentations in a newspaper article which are reasonably calculated to influence the investing public are actionable under 10b-5. *Texas Gulf Sulphur*.

## GOLDBERG

At Goldberg's request, his name appeared in the prospectus as having received $2,500 for financial advisory services.

Goldberg admits that he did not verify or attempt to verify any of the statements in the prospectus. He says that he did nothing other than give Lisac some general information about public offerings and refer Lisac to Gygi, a lawyer experienced in public offerings.

Goldberg contends that he may have been overpaid but such overpayment did not subject him to 10b-5 liability.

██ I am satisfied that one who is presented in the prospectus as a financial advisor who has been paid $2,500, is under a duty to at least make a minimal investigation into the accuracy of the prospectus. In Brennan v. Midwestern United Life Insurance, 286 F.Supp. 702 (N.D. Indiana 1968), aff'd. on other grounds, 417 F.2d 147 (7th Cir. 1969), the court concluded that silence and failure to act could be the basis for liability as an aider and abettor under 10b-5.

██ I believe that Goldberg is also liable because one who permits another to use his reputation and good will to further a fraudulent scheme may be liable under 10b-5. In Anderson v. Francis I. duPont & Co., 291 F.Supp. 705 (D.Minn. 1968), the complaint alleged that duPont and Ritten & Co. aided and abetted the principal defendant by permitting him to use their offices and facilities and by allowing him to bring visitors to their offices. Plaintiffs asserted that duPont and Ritten allowed the defendant to obtain customers by trading on their reputations when they knew, or should have known, that he was engaged in illegal and fraudulent activi-

ties. The court denied the defendants' motion for summary judgment.

It is difficult to equate the reputation of Goldberg with that of duPont & Co. and Ritten & Co. Nevertheless, prospective investors in Cryo-Freeze could reasonably believe that Goldberg, listed as a financial advisor who had been paid a substantial fee, was competent to approve and had approved the financial information in the prospectus.

Here, Goldberg did nothing which approached due diligence in his investigation of the Company. An individual who is held out in the offering prospectus as a financial consultant is required by 10b–5 to undertake at least a minimal investigation into the accuracy of the prospectus. Goldberg is liable to those stockholders who purchased in reliance on the prospectus. Whether he profited from the misrepresentations in the prospectus is irrelevant. Drake v. Thor Power Tool Co., 282 F.Supp. 94 (N.D. Ill.1967).

## JUNE S. JONES CO.

The public offering ended about January 23, 1968. On January 26, 1968, June S. Jones entered into the back-dated underwriting agreement, not to sell more stock but solely to avoid any difficulties with NASD rules.

The plaintiffs seek to hold Jones liable on the reasoning in Escott v. Barchris Construction Corp., 283 F. Supp. 643 (S.D.N.Y.1968). In *Escott* the plaintiffs sought relief under Section 11 of the Securities Act of 1933, which does not contain the purchase or sale requirement of 10b–5. In my view, Jones is not liable under 10b–5 to a class of stockholders who purchased on the original offering issued before Jones became an underwriter.

The plaintiffs suggest that Jones may be liable under 10b–5 for failing to disclose that it was making a market in Cryo-Freeze. See Chasins v. Smith Barney & Co., 438 F.2d 1167 (2d Cir. 1970). No named plaintiff has alleged that he purchased stock from Jones. The action against Jones will be dismissed.

## COOK AND YOUDE

On January 4, 1968, Cook and Youde were elected to the Cryo-Freeze Board of Directors. Youde was shown the prospectus on December 29, 1967; Cook read the prospectus in early January, 1968. Their names and backgrounds were attached as a supplement to the prospectus after they were elected to the board. Almost all of the stock sold during the public offering was sold before Cook and Youde became directors.

Plaintiffs again rely on *Escott* to impose liability on Cook and Youde. In *Escott* the court held that an outside director was liable under Section 11 for errors in the registration statement even though he was elected after the original registration statement had been filed. 10b–5 does not impose strict liability on a director. I find that they are not liable for the misrepresentations in the prospectus.

I also find that neither Cook nor Youde had any reason to disbelieve or that they failed to exercise due diligence with respect to the March 20, 1968 report.

But they are liable for the misstatements in the 1968 Annual Report. The Directors saw the July to September 27, 1968 financial statement before they approved, issued and circulated the 1968 Annual Report. This statement showed a loss of more than $30,000 for that period. Even though they did not have a profit and loss statement for the period ending December 31, 1968, until after the 1968 Annual Report was issued, they knew or are chargeable with knowledge that Cryo-Freeze had suffered heavy losses through September, 1968, and that the Company would probably experience heavy losses the remainder of the year. They also knew that these losses were not reflected in the Report. Both Cook and Youde are liable to members of the class who purchased in reliance on the 1968 Annual Report.

■ By January, 1969, Cook and Youde were aware of the losses Cryo-Freeze suffered during the previous year. I find that both Cook and Youde violated 10b–5 when they sold Cryo-Freeze stock in 1969 based on undisclosed inside information.

### CHEIFETZ

Howard Cheifetz was not a director of Cryo-Freeze. He was employed by Airco, the company that was producing the nitrogen freezing tunnel for Cryo-Freeze. He is described as "Technical Consultant" in the prospectus and he received stock options for 5,000 shares as payment for his services. He did not exercise any of these options.

■ Cheifetz knew of the discoloration problem. He helped Gygi and Lisac prepare the prospectus and did not bring it to their attention. In my opinion, Cheifetz, as technical consultant, was under a duty to alert the directors to the discoloration problem.

Cheifetz contends that the company had serious financial problems before the freezing tunnel was put in operation and the failure to disclose the discoloration problem could not have caused the company's financial condition or the plaintiffs' losses. Globus v. Law Research Service, Inc., 418 F.2d 1276 (2d Cir. 1969), cert. denied, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). Nothing in *Globus* requires the misrepresentation to be the sole cause of the plaintiffs' loss. Here, the discoloration problem contributed to Cryo-Freeze's downfall. In the prospectus for the proposed but never issued offering of preferred stock in February, 1970, Gygi stated that the discoloration problem was significant in Cryo-Freeze's failure to market retail meats. Had nitrogen frozen meats found a receptive market, Cryo-Freeze may have been able to overcome its financial problems.

### SCHMITZ

In 1966, Schmitz sold his business and equipment to Philco and became an employee. He was an original director of Cryo-Freeze.

■ Schmitz justifiably relied upon the expertise of Gygi, Lisac and Owens in evaluating the accuracy of the prospectus. Schmitz was Cryo-Freeze's salesmanager, but he had no experience with nitrogen freezing nor was he experienced in financial matters. Even under Section 11 of the Securities Act, a director may reasonably rely on portions of a prospectus which are outside his field and which are based on the expertise of other persons. *Escott, supra.*

Nevertheless, Schmitz admitted that he was aware of the increasing losses during the period July to December, 1968. His acquiescence in the 1968 Annual Report makes him liable under 10b–5 to those who purchased in reliance on that statement.

In May, 1969, after he had seen financial statements showing serious company loss in 1968, Schmitz sold 500 shares of stock. This sale was based on undisclosed material inside information for which he is liable.

### OWENS

Weir Owens was the Cryo-Freeze accountant. He was the secretary of the Company and the prospectus stated that he had performed accounting services for the Company since 1961. He was elected a director on December 1, 1967.

■ An accountant may be liable under 10b–5 for errors in a prospectus. Drake v. Thor Power Tool Co., *supra.* Although Owens could justifiably rely on technical information supplied by Lisac, Gygi and Cheifetz, he is liable for errors in the financial statement.

Owens contends that as an accountant performing an unaudited write-up, he is not liable for the errors in the Cryo-Freeze prospectus. This argument misses the point. Owens is not being charged with the information of which he was unaware or which would have been disclosed by a full audit. He is being charged with information which he knew or should have known.

■ Owens was not an outside accountant called in to perform a single

write-up. He had been the Company's accountant since 1961 and was familiar with its equipment and with the action filed against Designs Unlimited. Even when performing an unaudited write-up, an accountant is under a duty to undertake at least a minimal investigation into the figures supplied to him. He is not free to disregard suspicious circumstances. 1136 Tenants' Corp. v. Max Rothenberg & Co., 36 A.D.2d 804, 319 N.Y.S.2d 1007 (1972), aff'd 30 N.Y.2d 585, 330 N.Y.S.2d 800, 281 N.E.2d 846 (1972). Owens' testimony that he merely accepted Lisac's oral statement that the equipment was valuable does not satisfy the requirement of due diligence. *Texas Gulf Sulphur, supra.*

Owens is also liable for errors in the March 20, 1968 Report and the Annual Report. He, more than any other defendant, was in a position to accurately assess the financial condition of the Company. Nevertheless he permitted the erroneous reports to be distributed to the public.

### LISAC

■ Philip Lisac was connected with every misrepresentation. The only issue here is whether he sustained his due diligence defense for any one of them. I find that he has not.

Lisac helped prepare the prospectus. He knew the leased equipment was worthless. He also knew that none of the estimates in the section on the proposed use of the proceeds were firm. I find that Lisac knew the prospectus contained misrepresentations and that the prospectus failed to include relevant facts.

Lisac admitted that he included the statement "profits are now running at $2,000 per month" in the March 20 Report without reference to any financial statement.

The First Quarter Interim Report was prepared by Lisac without approval by the Board of Directors. This report contained predictions for which there was no basis and failed to disclose losses.

The Gerry Pratt article in the *Oregonian* contained similar predictions. It also failed to disclose losses for 1968. Lisac admitted that the article was a correct representation of the information he had given to the author.

In early 1969, Lisac sold 4,000 shares at a substantial profit. This sale was based on undisclosed material inside information.

I find Lisac liable to the entire class.

### GYGI

■ Robert Gygi was primarily responsible for drafting the Prospectus, the March 20 Report, and the Annual Report. The sole issue here is whether Gygi sustained his due diligence defense.

Gygi has attempted to picture himself as an outside attorney hired by a company solely to prepare a prospectus. He relies on a statement by the plaintiffs that he is being sued as an attorney and not as a director. I am not bound by such statement, and I find that he is liable both as a lawyer and as a director.

Mr. Gygi is an intelligent man. He is a graduate of Harvard Law School and has been a member of the Oregon Bar since 1960. He was experienced in the securities field and had handled numerous public offerings.

■ An attorney cannot escape liability for fraud "by closing his eyes to what he saw and could readily understand." SEC v. Frank, 388 F.2d 486, 489 (2d Cir. 1968). Both as an attorney and as a director, Gygi knew or should have known of the misleading financial information in the prospectus which he should have investigated. Here, Gygi's role was "beyond a lawyer's normal one," and he is held to even a higher standard of care. SEC v. Frank, *supra*, at 489.

Gygi is also liable for the errors in the March 20 Report and the Annual Report. He, more than any other defend-

ant, knew the importance of carefully investigating the validity of the statements in these reports.

In 1969, Gygi and his law partner Bruce Engel sold 2,750 shares of stock at a substantial profit. This sale was based on undisclosed inside information and violated 10b–5.

I therefore find that Philip Lisac is liable to the entire class. Robert Gygi and Weir Owens are liable to those stockholders who purchased in reliance on the prospectus, the March 20 Report and the 1968 Annual Report. Herman Goldberg and Howard Cheifetz are liable to those stockholders who purchased in reliance on the prospectus. Schmitz, Cook and Youde are liable to those stockholders who relied on the 1968 Annual Report.

Gygi, Engel, Schmitz, Cook and Youde must account for their profits from sales of Cryo-Freeze stock which violated Rule 10b–5.

This opinion shall serve as findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

On Motion to Supplement Opinion

Plaintiffs have asked me to supplement my opinion of November 28, 1972, to add a provision that the defendants' violations of Federal Securities Law, Rule 10b–5 (17 C.F.R. 240.10b–5), also constitute violations of the Oregon Securities Law, ORS 59.115 and ORS 59.135. Because Rule 10b–5 is similar to ORS 59.135, plaintiffs contend that a violation of the federal law must also be a violation of the state law. In the complaint and in the pretrial order, plaintiffs sought relief under both federal and state securities law.

This case was originally filed in June, 1970. Since then, plaintiffs have submitted many voluminous briefs and memoranda containing a great number of legal authorities. All of them dealt solely with federal law. Plaintiffs did not discuss whether ORS 59.115 and 59.-135 provide the same remedies or create the same liabilities as Rule 10b–5. They

did not cite a case construing the Oregon statutes. The only Oregon case brought to my attention is contrary to the plaintiffs' position. Zucker v. Parker, et al., No. 371–069 (Circuit Court of the State of Oregon, County of Multnomah, November 3, 1972).

The motion to supplement the opinion is denied.