Argued and submitted July 24, 1981, affirmed January 25,
reconsideration denied March 11,
petition for review denied April 6, 1982 (292 Or 825)

In the Matter of the Compensation of
Robert Gygi, Claimant.

## STATE ACCIDENT INSURANCE FUND CORPORATION,

*Petitioner,*

*v.*

## GYGI,

*Respondent.*

(No. 79-9683, CA 19945)

639 P2d 655

Darrell E. Bewley, Appellate Counsel, State Accident
Insurance Fund Corporation, Salem, argued the cause for

petitioner. With him on the brief were K. R. Maloney, General Counsel, and James A. Blevins, Chief Trial Counsel, State Accident Insurance Fund Corporation, Salem.

Robert K. Udziela, Portland, argued the cause for respondent. With him on the brief was Pozzi, Wilson, Atchison, Kahn & O'Leary, Portland.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

RICHARDSON, P. J.

THORNTON, J., dissenting opinion.

## RICHARDSON, P. J.

The State Accident Insurance Fund appeals from the order of the Workers' Compensation Board which affirmed the hearing referee's decision that claimant's mental illness is a compensable occupational disease. SAIF contends the Board erred in determining that claimant's psychiatric disability was caused or aggravated by on-the-job stress. ORS 656.802(1)(a). We review *de novo,* ORS 656.298(6), and affirm.

Claimant has been a self-employed[1] attorney since his graduation from law school in 1960. He specialized in business and corporation law, and in the late 1960's he became involved in arranging public stock offerings for corporations. Following the decline of the stock market in 1969, several of the corporations claimant represented began to founder. In 1970 he was named defendant in a class action brought on behalf of shareholders of one of those corporations. The complaint sought several million dollars in damages, far in excess of claimant's malpractice insurance coverage. In 1972, after a partial trial, claimant was found to be liable.[2] The case was finally settled late in 1974. Claimant was named defendant in at least three other similar shareholder suits in the period from 1970 to 1976. After claimant's liability was established in the first class action, the Oregon State Bar brought a disciplinary proceeding against him early in 1974. In November, 1975, the Supreme Court dismissed the proceeding.[3] During the time of these actions against him, claimant suffered a considerable loss of professional respect. This, plus adverse media publicity and the large amount of time spent working on his own defense and on attempts to salvage the corporations, led to loss of income and a decrease in new clients.

In November or December of 1973, claimant began to drink alcohol excessively and to abuse over-the-counter and prescription tranquilizers and anti-depressants. As claimant explained:

[1] Claimant is covered as a "subject worker" by SAIF under ORS 656.128.

[2] *Blakely v. Lisac,* 357 F Supp 255 (D Or 1972).

[3] *In re Robert Neil Gygi,* 273 Or 443, 541 P2d 1392 (1975).

"* * * I began to feel guilty about what had happened to these corporations and to the shareholders' losses. I felt since I had a particular gift for getting those companies public, I bore a large responsibility for saving them. In most cases, I wasn't able to do it; and the stress of the lawsuits and the affect on my reputation, they just all combined and made me feel very guilty about myself and the way to avoid feeling guilty was to drink."

From January, 1975, through March, 1979, claimant was hospitalized on a number of occasions and treated for acute depression, alcohol abuse and attempted suicide.

Claimant filed a claim for compensation for depression and alcoholism. The referee concluded that claimant's condition was the cumulative result of employment-related stress and therefore was compensable under ORS 656.802(1)(a). The Board affirmed, and SAIF appeals.

SAIF contends that claimant abuses alcohol in reaction to stress from any source and reacts the same way to employment-related stress and stress from off-the-job conditions. Thus, SAIF argues, claimant failed to prove that his condition arose from circumstances "to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment." ORS 656.802(1)(a).

In *James v. SAIF*, 290 Or 343, 624 P2d 565 (1981), the court held that a claimant seeking compensation for an occupational disease must show not only that the condition arose within the scope of employment, but must also establish that the condition "was caused by circumstances 'to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment.' ORS 656.802 (1)(a)." 290 Or at 348. The court noted that the condition need not be *caused* by on-the-job factors, but rather that "the cause of the disease, *aggravation* or *exacerbation* of the disease must be one which is ordinarily encountered only on the job." 290 Or at 350. (Emphasis added.) *See Weller v. Union Carbide*, 288 Or 27, 602 P2d 259 (1979); *Beaudry v. Winchester Plywood Co.*, 255 Or 503, 469 P2d 25 (1970). The court laid out a test for making this determination:

"* * * If this off-the-job condition or exposure is a condition substantially the same as that on the job *when*

*viewed as a cause* of the particular kind of disease claimed as an 'occupational disease,' it precludes the claim under ORS 656.802(1)(a). * * * " 290 Or at 350 (emphasis original).

We do not interpret the Supreme Court's test to require that the at-work conditions be the sole cause of disability. In *Beaudry v. Winchester Plywood Co., supra,* the court held that aggravation of the claimant's preexisting bursitis condition was compensable as an occupational disease. The claimant's work activities required him to stand for eight hours on a vibrating platform which the medical evidence described as the "most traumatizing activity" relating to his disability. Compensation was allowed, even though the evidence indicated the claimant's bursitis was aggravated by nonwork activities of standing, walking and climbing stairs. *Beaudry* was cited with approval in *James v. SAIF, supra.*

■ ■ We conclude that ORS 656.802(1)(a) does not require that the occupational disease be caused or aggravated solely by the work conditions. If the at-work conditions, when compared to the nonemployment exposure, are the major contributing cause of the disability, then compensation is warranted.

The psychiatrists who examined claimant essentially agree in their diagnoses: chronic, severe or psychotic depression or depressive neurosis, complicated by chronic alcoholism. They were not unanimous, however, in their identification of the source of claimant's problems.

Dr. McCulloch, claimant's treating psychiatrist from the first hospitalization in 1975 until September, 1978, reported: "Mr. Gygi has suffered chronic and severe depression and alcoholism which was aggravated by the nature of his work and the extensive disciplinary proceedings against him." A second physician, Dr. Atkinson, treated claimant during his five-month hospitalization in 1978-79. He stated: "I agree that both illnesses diagnosed above [i.e., psychotic depression and chronic alcoholism] are *in part* the result of employment-related stress. Work severely aggravated patient's proneness to mental illness." Dr. Atkinson also stated: "Given the long, complicated history, it is nearly impossible to accurately determine the

proportion of illness caused by job-related stress. It was a substantial factor."

At SAIF's request, claimant was examined by three psychiatrists. Dr. Quan, who examined claimant September 7, 1979, reported:

"On the basis of what Mr. Gygi reports to me, he provides a sequence of events which strongly supports his contention that his depression and alcohol abuse followed reverses that related to his practice of law. * * * That his personality could be regarded as vulnerable to situational stresses, especially of the magnitude that he encountered seems also clear.

"* * * * *

"Without other, possibly more objective, data, Mr. Gygi's reported history seems reasonable and on that basis, it would appear that his mental condition has been aggravated by the stress of his work."

Dr. Colbach examined claimant on October 1, 1979. He reported:

"This man gives a history of long standing personality defects. He apparently has always been an insecure, anxious, somewhat passive dependent personality whose high intelligence helped get him through life. Twenty years ago he was taking antidepressant medication, however, and in 1966 he had his first indications of an alcohol problem.

"Still he was able to make it in life. His real downfall began in the 1970's due to problems in his law practice here in Portland. These problems have apparently exacerbated his preexisting personality defects, leading to an increased reliance on alcohol, drug abuse and recurring depressions, at least one of which was psychotic in nature.

"My diagnoses would essentially be the same as those of Dr. Quan. * * *

"* * * * *

"This has to be seen as one of those borderline cases. Obviously this man has long standing personality problems. Because of these problems he ran his law practice in a rather erratic manner and directed his practice into a very risky area. He involved himself in some marginal situations which backfired on him, leading to his further mental deterioration. When the practice fell apart, he fell apart. So the stresses of his practice did contribute to many of his current difficulties. It is just about impossible for me to say how much responsibility for this SAIF should assume."

■    Finally, Dr. Parvaresh examined claimant on October 17, 1979. He identified three etiological factors for claimant's "psychiatric problem": (1) the excessive drinking stemming from his marriage difficulties in 1966-67; (2) claimant's upbringing - the "push for achievement without reward"; and (3) "what he went through between 1970 and 1975" - the stress of the lawsuits and the disciplinary proceedings. Referring to this third factor, Dr. Parvaresh stated:

> "* * * On face value, this may indicate added stress which might very well have aggravated a pre-existing condition. On the other hand, on closer scrutiny one finds that he began to create problems for himself within his practice by making bad decisions and giving poor advice because of his underlying psychiatric problems which had pre-existed the subsequent stresses on the job. That is to say, had he not made poor professional decisions because of his underlying psychiatric problem, he probably would not have had the lawsuit and disciplinary action against him and therefore there would not have been the stresses that he believes aggravated his psychiatric condition. I do not know whether a psychiatrist can adequately answer this, this is a question of social policy, that is how far the State Accident Insurance Fund would go to cover an employee. As I understand the present policy indicates what happens on the job materially contributed to the workman's injury and if I am interpretting this correctly, then Mr. Gygi's problem appears to me not job related."

Dr. Parvaresh clarified this statement in a deposition made part of the record before the referee. He explained that claimant's situation differed from the case of a mediocre lawyer who is working over his head. In the latter case, on-the-job stress obviously would be the cause of psychiatric problems. On the other hand, claimant was extremely intelligent and competent, and he was doing a job he was capable of handling. Claimant's problem was his own creation, the result of his preexisting neurosis and predilection for alcohol. Job stress, then, the doctor said, was not the cause of claimant's problem.[4]

---

[4] The relevant portion of Dr. Parvaresh's deposition states:

"Q Doctor, we have a fairly unique individual here, in that — I don't believe there's any question that he was extremely intelligent, well-respected, foremost in his field, and then these sort of problems developed. Suppose,

We conclude that claimant's condition was aggravated by stress that he was subjected to while on the job. Certainly he was highly susceptible to depression and alcoholism resulting from stress in many situations in his life. Nonetheless, when viewed as a cause of his disability, the stress he faced while on the job was of greater intensity and was not substantially the same as the stress faced off the job. *James v. SAIF, supra,* 290 Or at 350. In short, the work-related stress was the major contributing cause of claimant's disability.

Claimant's treating psychiatrists both state that on-the-job stress aggravated his preexisting mental health

---

Doctor, we had an individual who was of a mediocre nature in law school and in performance and was put into this position of responsibility. Would your opinion change as to the course of the materiality of the pressure, the job stress?

"A Yes.

"Q Would you explain that a little bit, please?

"A For the sake of understanding, I believe Mr. Gygi, when he started his law practice, because he was knowledgeable, he had good educational background, he was quite sharp and smart, he really didn't have any problem dealing with what the job required of him. But this was his own psychological problem that created secondary problem for him, so he runs into problem.

"On the other hand, if, say, Mr. Gygi was not really so sharp, and he was not so up to date on the type of work he did, yet he joined the law firm that suddenly placed him into a position where he had to do things that were well above, well over his head, and yet he couldn't afford really to come forward and say, 'I can't do this,' because this was a good job that was given to him. At that point, yes, the job would materially contribute to the problem. In other words, the person who was functioning within his own limitation had no problem before, that suddenly he gets in a job that is way over his head, then he's going to begin to worry about his competency, whether or not he's doing a good job, he's going to very anxious because he's dealing with issues that he's not too well versed on.

"Q You are talking about the hypothetical mediocre person?

"A Yes. So in that response, you don't really have much problem as a psychiatrist to understand why he got upset, because suddenly he was faced with something he was not really trained to handle, and he was not competent to deal with.

"Q But in this case, what is the difference?

"A The difference really is that Mr. Gygi is a very — at least at the time was extremely smart, sharp, trained, he was respected, so he really didn't have any problem dealing with what his job required of him. And had he not had the psychological problem in the form of neuroses and alcoholism, he would not have had problems; he would have continued to be successful in what he did, so these two are quite different issues."

problem. The three examining psychiatrists agree in their diagnoses and, except for Dr. Parvaresh, agree that on-the-job stress substantially aggravated his condition. While Dr. Parvaresh does not concur, it appears that he is making a judgment of social policy, not a medical judgment. Although claimant, being self-employed, may have been the author of his own downfall, his condition arose because of his response to the demands of his law practice.

Affirmed.

**THORNTON, J.,** dissenting.

My review of this record convinces me that claimant has not established by a preponderance of the evidence that his alcoholism and physical and mental breakdown constituted a compensable occupational disease arising out of and in the course and scope of his employment. Contrary to the view of the evidence taken by the majority, the evidence persuades me that claimant's condition did not result from on-the-job stress.

Unlike the claimants in *James v. SAIF,* 290 Or 343, 624 P2d 565 (1981), and *Paresi v. SAIF,* 290 Or 365, 624 P2d 572 (1981), which the majority relies upon, this claimant for the most part created his own problems and his own stresses. There have been a number of similar cases involving claimed on-the-job stress. In each case we concluded after a *de novo* review of the record that the claimant had not established by a preponderance of the evidence an occupational disease (or industrial injury). These include the following: *Friesen v. Gould Inc.,* 18 Or App 120, 523 P2d 1285 (1974), where a bookkeeper-clerical worker complained of work stress related to her immediate supervisor, which allegedly cause a nervous upset; *Williams v. SAIF,* 36 Or App 211, 584 P2d 327, *rev den* 284 Or 235 (1978), where an administrative official in the Bureau of Labor complained of work stress which allegedly produced what amounted to an occupational disease. Another case involving in part claimed work stresses incident to the practice of law, and in which we also rejected a claim of work-connected disability, is *Giovanini v. SAIF,* 35 Or App 352, 581 P2d 139 (1978). In *Giovanini* this court affirmed without opinion a decision of the Workers' Compensation Board denying compensation where claimant had suffered

a myocardial infarction after an extended period of heavy legal work which was followed by a violent family argument after he had returned home in the evening.

A claim of emotional stress was also involved in *Robb v. Employment Div.*, 54 Or App 471, 635 P2d 392 (1981), an unemployment compensation case. This court affirmed a decision of the EAB which held that claimant had failed to establish that her stress problems were of such gravity that she had no alternative but to resign her employment and denied her unemployment compensation claim.

On the basis of the above authorities, in my view it would be an unwarranted expansion of workers compensation to rule in the case at bar that claimant is presently suffering from a bona fide occupational disease and to charge these claim costs to the State Accident Insurance Fund.

For the above reasons, I respectfully dissent.