Argued and submitted December 17, 1984, affirmed July 3, 1985

In the Matter of the Compensation of
Peter F. McCabe, Claimant.

## STATE ACCIDENT INSURANCE FUND CORPORATION,
*Petitioner,*

*v.*

## McCABE,
*Respondent.*

(82-01704; CA A32445)

702 P2d 436

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause for petitioner. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Robert K. Udziela, Portland, argued the cause for respondent. With him on the brief were Dan O'Leary, and Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

SAIF petitions for review of an order of the Workers' Compensation Board affirming the referee's decision that claimant's disability is compensable as either an occupational disease or an occupational injury. Claimant's disability resulted from a ruptured cerebral aneurysm. We hold that claimant has established a compensable occupational disease.

SAIF does not contest the facts leading up to claimant's disability, including the condition of his employment. The principal dispute revolves around the medical explanation of the cause of the disability and involves two conflicting medical opinions.

Claimant was elected the chief executive officer of the Amalgamated Transit Workers Union in Portland in May, 1979, when he was 29. He had no previous experience as a union official. His job as chief executive officer involved a considerable amount of stress. After his election, he found that the executive board of the union was antagonistic toward him and uncooperative in assisting him in union business, and he began to assume much of the work that ordinarily would have been done by the executive board. Six and seven day work weeks were not unusual, and he often received phone calls at home concerning union matters. He rarely worked fewer than eight hours per day and frequently worked sixteen. He was involved in collective bargaining on the union's behalf. He sometimes traveled away from home overnight two days per week when contract negotiations were not in session; he traveled more often when they were.

In the fall of 1980, claimant learned of the possibility of financial irregularities occurring in the union. This greatly distressed him, and he became obsessed with investigating the matter. A lawyer advised him that the best course of action was to file a lawsuit against the executive board and other union officers. Claimant realized that that action would be the final break between him and the executive board and that he would likely lose his job if the allegations of financial irregularities were proven. He spent a great deal of time brooding over this matter in the summer of 1981.

During that time, claimant's personal habits,

attitudes, demeanor and personality began to change significantly. His cigarette consumption increased to two and one-half packs per day, and he began to drink heavily. He exhibited impaired mental acuity, often forgetting matters related to the union's business. For example, he occasionally questioned subordinates about why they were taking certain actions, only to learn that he himself had instructed that those actions be taken. He frequently complained of headaches. Finally, he uncharacteristically erupted in outbursts of anger towards his associates and his children.

In December, 1980, after having been diagnosed as having high blood pressure, claimant began treatment with Dr. Fleming, a clinical psychologist, for anxiety and hypertension. The treatments continued until June, 1981. Dr. Fleming concluded that claimant's problems were caused by the stress associated with his employment and recommended, on a number of occasions, that he resign. Claimant agreed that he should quit his job and told Dr. Fleming that he would do so after the national convention in the fall.

On the evening of September 25, 1981, claimant was in Eugene for a union meeting. After it concluded, at about 10:15 p.m., he called the managing director of the city transit district. That call upset him, and he became very angry about it. He joined several union members in a hotel lounge and described the woman with whom he had spoken in very derogatory terms, which was uncharacteristic of his normal behavior. Shortly afterwards, he repeated the entire conversation again, as if the first had never taken place. He later left the lounge and went to his hotel room. There, while engaged in sexual intercourse, he suffered a ruptured cerebral aneurysm. He was rushed to the emergency room. The ruptured aneurysm and the resulting complications left claimant severely disabled.

SAIF denied claimant's claim for benefits. He requested a hearing, and the referee decided that the claim was compensable as either an occupational disease or an injury. The Board adopted and affirmed the referee's decision, one member dissenting.

We need not address the issue of whether the claim is

compensable as an injury, because we hold that it is compensable as an occupational disease. The medical evidence indicates that claimant's aneurysm was congenital. To establish an occupational disease claim relating to a preexisting condition, a claimant must prove that work conditions caused a worsening of the underlying condition producing disability or the need for medical services. *Weller v. Union Carbide,* 288 Or 27, 602 P2d 259 (1979). Additionally, he must establish that the work conditions were the major contributing cause of the worsening of the preexisting condition. *Dethlefs v. Hyster Co.,* 295 Or 298, 667 P2d 487 (1983); *SAIF v. Gygi,* 55 Or App 570, 639 P2d 655, *rev den* 292 Or 825 (1982).

Two doctors, neither of whom examined claimant, testified at the hearing. They disagreed over the cause of the ruptured aneurysm. The parties have devoted a substantial portion of their briefs to a discussion of which doctor was more qualified to express an opinion. We find both well qualified.

Dr. Uhland testified in claimant's behalf. He is a board-certified specialist in internal medicine and has had considerable experience with cardiovascular medicine. His testimony indicates that work stress was the major contributing cause of the disability. He stated that claimant was probably born with the aneurysm and that the enormous amount of work stress and the intermittent rise in blood pressure exhibited in the months preceding the rupture caused a thinning of the walls of the aneurysm. The walls became so thin that small amounts of blood leaked out. That leakage, he testified, would explain the headaches, memory lapses and personality changes that claimant suffered. He agreed that the act of sexual intercourse was the precipitating event causing the rupture but stated that work stress contributed "in a major way" to claimant's disability by weakening the wall of the aneurysm. He testified that, in his opinion, the aneurysm would not have ruptured as soon as it did without the weakening of the arterial wall caused by the work stress induced rise in blood pressure.

Dr. Raaf, board certified in neurosurgery, testified for SAIF. In a report before the hearing, he stated that the aneurysm was the result of a defect in the arterial wall and that claimant's work was not a factor in the cause of the aneurysm or its rupture. At the time he wrote the report he

had not read some of the relevant medical reports discussing claimant's personality change and showing his elevated blood pressure. At the hearing, however, he stated in response to a hypothetical question that included claimant's work history that his opinion was unchanged by those additional facts. His opinion was that the aneurysm was a congenital defect which naturally weakened with age and that the sexual intercourse caused an increase in blood pressure, causing the aneurysm to rupture. He stated that the act of sexual intercourse was the major contributing cause of claimant's disability. He testified that he was aware of no scientific information that intermittent rises in blood pressure cause an aneurysm to weaken.

Dr. Mundall was one of the physicians who treated claimant in the emergency room. He stated in a letter to SAIF that claimant's condition "was not likely due to the work he was performing for the Amalgamated Transit Union but was rather a natural progression of a weakening in the wall of his blood vessel that he was probably born with and then precipitated by physical exertion."

We are confronted with two opposing theories. On *de novo* review, we are free to choose which medical hypothesis is correct, *Coday v. Willamette Tug & Barge,* 250 Or 39, 49, 440 P2d 224 (1968), and we find Dr. Uhland's more persuasive. Unlike Dr. Raaf, he had examined all of the medical reports before the hearing and was therefore apparently better acquainted with claimant's medical history. His testimony was well-reasoned. Dr. Raaf's answers were not as well-explained as Dr. Uhland's. Dr. Mundall's letter supports Dr. Raaf's theory, but it does not explain why work was not a major factor in claimant's disability or whether he was even aware of the amount of stress involved in claimant's work. In short, we find Dr. Uhland's theory more persuasive.

Affirmed.