Argued and submitted May 24, 1985, reversed; referee's order reinstated
January 29, 1986

In the Matter of the Compensation of
Lillie G. McClendon, Claimant.

McCLENDON,
*Petitioner,*

*v.*

NABISCO BRANDS, INC.,
*Respondent.*

(83-10845; CA A33908)

713 P2d 647

Elliott Lynn, Beaverton, argued the cause and filed the brief for petitioner.

Cynthia S.C. Shanahan, Portland, argued the cause for respondent. With her on the brief were Lawrance L. Paulson and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

WARDEN, J.

## WARDEN, J.

Claimant petitions for judicial review of a Workers' Compensation Board order reversing the referee's opinion which ordered employer to accept her claim. On *de novo* review, we reverse and reinstate the referee's order.

Claimant was an assembly line worker with Nabisco for 13 years, working primarily on the high volume chocolate chip, Oreo and cracker lines. Her work involved quick, repetitive motions, twisting, reaching and lifting loads of approximately two pounds. The arm movements ranged from waist to eye level. She first experienced shoulder irritation in the summer of 1982. She went to the company nurse for aspirin and heat application and apparently saw the nurse on other occasions for her shoulder problem after the first visit. In April, 1983, she took a one-month vacation, during which her condition improved. When she returned to work, her shoulder worsened substantially. She again reported to the nurse and was seen by the company physician, Dr. Eisendorf, for the first time. She continued to experience pain, and Eisendorf suggested that she come to his office for an x-ray of the shoulder. Thereafter, he referred her to Dr. Post, an orthopedist.

Post reported, after comparing x-rays of June, 1982, and September, 1983:

> "The right A-C joint is partially obscured by the 'right' marker but there do seem to be two areas of escallop change in the distal clavicle. The acromion, less well seen, does not show the superior defect seen on the later A-C joint films of September 1983 * * * I think it is clear that pre-existing changes as long as a year and a half ago were present.
>
> "* * * This type of picture is seen sometimes with degenerative arthritis of the A-C joint as reported in weightlifters. With these changes clearly evolving over the past year and a half and yet with symptoms only over the past half year or so, this would seem to be a pre-existing condition without specific industrial relationship."

Claimant was examined by Dr. Cherry, an orthopedist, in October, 1983, and he has been her treating physician since then. He was apprised of her history, and she demonstrated for him the repetitive movements performed at her employment. Cherry reported that "[i]t is my impression

that this woman does have osteoarthritic change of the right acromioclavicular joint due to or aggravated by her occupation." Later he stated:

"Repeat x-rays on December 5, 1983, showed what appeared to me as more involvement in this joint with probable destructive process at this right AC joint.

"It is my opinion that this is probably an occupational disease type involvement of this joint."

At the request of employer's attorney, Eisendorf wrote:

"I am quite familiar with the patient's background and history and with Dr. Post's reports and have again reviewed them.

"After careful consideration of her right shoulder problem, it is my opinion that the process in her right shoulder and acromioclavicular joint is probably of medical origin and not directly due to her employment. She may have had an occupational aggravation of her shoulder problem."

Claimant does not drive and has few outside activities. There is no evidence that she engaged in any activity which required repetitive arm movements similar to those performed at work. In fact, housework, yard work and cooking at claimant's home have been performed by claimant's husband and sons for many years.

Employer denied the claim, concluding that claimant's condition did not arise from employment. The referee found claimant credible and the medical evidence persuasive and reversed the denial. The Board reversed the referee's decision and reinstated the denial.

The referee correctly concluded that this was an occupational disease case. ORS 656.802(1)(a) defines an "occupational disease" as "[a]ny disease or infection which arises out of and in the scope of the employment, and to which an employe is not ordinarily subjected or exposed other than during a period of regular actual employment therein." Although the statute appears only to cover situations in which work activities have caused the disease itself, the Supreme Court has interpreted the statute broadly and has held a disease compensable when work activities have caused a worsening of a preexisting disease as well. *Weller v. Union*

*Carbide,* 288 Or 27, 31, 602 P2d 259 (1979). The cause, aggravation or exacerbation of the disease must be one ordinarily encountered only on the job. *James v. SAIF,* 290 Or 343, 350, 624 P2d 565 (1981); *SAIF v. Gygi,* 55 Or App 570, 573, 639 P2d 655, *rev den* 292 Or 825 (1982). If the condition preexisted employment, a claimant must prove that work activities worsened the underlying condition resulting in an increase in pain to the extent that it caused disability or required medical services. *Wheeler v. Boise Cascade,* 298 Or 452, 693 P2d 632 (1985); *Weller v. Union Carbide, supra,* at 35; *Devereaux v. North Pacific Ins. Co.,* 74 Or App 388, 391, 703 P2d 1024, *rev den* 300 Or 162 (1985). If the condition did not preexist employment, a claimant must prove that work activities were the major contributing cause of the condition itself. *Devereaux v. North Pacific Ins. Co., supra; SAIF v. Gygi, supra,* 55 Or App at 574.

■     We are confronted with conflicting medical opinions as to the causation and worsening of the disease. On *de novo* review, we are required to choose which medical hypothesis is correct. *Coday v. Willamette Tug & Barge,* 250 Or 39, 49, 440 P2d 224 (1968); *SAIF v. McCabe,* 74 Or App 195, 200, 702 P2d 436 (1985). In the absence of persuasive reasons requiring a contrary practice, we generally accord greater weight to the treating physician's opinion. *Weiland v. SAIF,* 64 Or App 810, 669 P2d 1163 (1983). We find that practice appropriate in this case.[1]

Cherry has treated claimant since October 21, 1983, and is familiar with the treatment begun by the two previous examining physicians and the results that they obtained. He

---

[1] The Board discredited Cherry's diagnosis, stating:

"[W]e are persuaded that Dr. Cherry's opinion is based upon a history of claimant's work activities that is inconsistent with the balance of the evidence, including claimant's testimony. Dr. Cherry apparently understood that claimant's work involved considerable overhead use of her arms; in fact, almost all of claimant's work involved using her arms at waist or chest height."

We disagree with the Board's analysis and conclusion. The perceived problem is due to Cherry's letter of October 24, 1983, in which he states that claimant "worked at Nabisco and worked fast and with the arms up, often above her shoulders or head." The statement is supported by the evidence. Claimant testified that she worked with her arms up. Many of the movements were at waist or chest level but, when she worked on the chocolate chip line, she had to place bags on a conveyor belt at eye level. That had to be done at least 12 times per minute. A co-worker fully corroborated that testimony.

has compared earlier x-rays with later ones that he ordered, enabling him to ascertain whether the condition had worsened. He attributed claimant's condition to her occupation.

■ The Board noted that Cherry did not quantify the magnitude of occupational causation. It stated that, "[w]hile 'magic words' are not essential, Dr. Cherry offers little in the way of explanation or analysis which could form the basis of a finding of *major* causation." Although Cherry did not use the words "major contributing cause," he did state that claimant's condition was "due to or aggravated by her occupation." He also referred to her condition as an "occupational disease type involvement." This language sufficiently strongly suggests that he found claimant's occupation to be the major cause, if not the sole cause, of her disability. Cherry's language supports the conclusion that it is more likely than not that work activities were the major contributing cause of claimant's condition or its worsening. When his opinion is juxtaposed with the evidence of claimant's repetitive arm movements at work, her lack of repetitive arm movements outside work and Eisendorf's opinion that her condition may have been aggravated by work, we are persuaded that claimant has satisfied her burden of proof.

■ We are not persuaded by Post's opinion, after comparing claimant's x-rays, that "[w]ith these changes clearly evolving over the past year and a half and yet with symptoms only over the past half year or so, this would seem to be a preexisting condition without specific industrial relationship." His conclusion rests on the assumption that claimant's symptoms were present only for about six months before his September, 1983, examination. However, claimant testified to irritation as early as the summer of 1982, and Eisendorf reported that claimant had given a "history of right shoulder problems on and off since 1982." Because Post's opinion is directly predicated on an erroneous assumption, we give it little weight. Furthermore, his conclusion that the condition was preexisting is ambiguous. It is uncertain whether he meant that it preexisted claimant's employment or just that it preexisted her symptoms. She worked for Nabisco for 13 years. There is no evidence that the condition preexisted her employment.

Reversed; referee's order reinstated.